John S. FREUND, Petitioner–Appellant,

v.

Robert A. BUTTERWORTH, Attorney General, Respondent–Appellee.

No. 93–5317.

United States Court of Appeals, Eleventh Circuit.

Jan. 22, 1999.

Paul Morris, Coral Gables, FL, for Petitioner–Appellant.

Melvina Flaherty, Myra J. Fried, Asst. Atty. Gen., West Palm Beach, FL, for Respondent–Appellee.

Before HATCHETT, Chief Judge, and TJOFLAT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES, HULL and MARCUS, Circuit Judges.

HATCHETT, Chief Judge:

Appellant-petitioner John Freund appeals the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1985, a Florida state court jury convicted Freund of first-degree murder for the 1984 stabbing death of Ralph Walker. The crux of Freund's petition was that he was deprived of his right under the Sixth and Fourteenth Amendments to effective assistance of trial counsel because his lawyers labored under significant conflicts of interest that stemmed primarily from their prior representation of Freund's non-testifying, separately-tried codefendant, John Trent. Addressing first impression issues concerning the applicable rules of law and standard of review, and finding no actual conflict and no adverse effect, we affirm.

## I. HISTORICAL FACTS [1]

### A. Background on the Six Persons Present at the Murder Scene

#### 1. John Freund

Before 1983, John Freund practiced oncology, the treatment of cancer, in Palm Beach, Florida. He enjoyed an excellent reputation in the medical community for both his professional expertise and personal demeanor. Unknown to most of his colleagues, Freund suffered from severe bouts of depression. In June 1983, he attempted suicide at home, injecting himself with large doses of narcotics. A police officer found him unconscious, and subsequent psychological tests and CAT scans of his brain indicated significant brain damage due to a lack of oxygen. Among Freund's symptoms were impaired memory, reduced intelligence, inappropriate behavior, poor judgment, lack of foresight and planning, amenability to others' influences, and a reduced ability to reason and appreciate the consequences of his actions. Consequently, health care officials suspended, and never reinstated, Freund's hospital privileges.

#### 2. John Trent

Before the suicide attempt, Freund befriended John Trent, the son of one of his patients. Although Freund and Trent's friendship soured at some point, they rekindled it after Freund's suicide attempt. Trent promised to help Freund regain his hospital privileges. Trent enjoyed a reputation of wielding significant, though illicit, influence in the Palm Beach community.

Trent owned a legitimate interior design business called House of Draperies, but his main occupation was a full-time criminal. He involved himself heavily in drugs (both use and sale), violence and prostitution. When tenants of his several rental properties failed to pay their rent on time, Trent had them assaulted. Trent kept more than one residence (and girlfriend) in the Palm Beach

area. Around the time of the murder, he lived in an apartment at the Palm Beach Hotel. Although the building had a doorperson, front desk attendants and security guards, Trent usually answered his door waving a loaded .45 caliber pistol. When friends visited, he often had them use cocaine with him immediately before they did anything else.

Trent claimed to have ties with the local police through his work as a confidential informant. He bragged that he had the West Palm Beach Police Department and Palm Beach County Sheriff's Office "in his back pocket." He wielded significant influence over several other persons, using them to further his drug dealings, work as prostitutes, entertain him, "take out" those who gave him trouble and perform various other tasks. Four such persons were at Trent's apartment, along with Freund, on the night of the murder: three testified at Freund's trial and the fourth was the victim.[2]

#### 3. Eleanor Mills

The first of these persons was Eleanor Mills. Mills ran a female escort service and frequently used drugs. In early 1984, an undercover police officer arrested her after she attempted to sell him a kilogram of cocaine. While in pretrial detention, Mills met someone who suggested that Trent, then a stranger to Mills, could help her with the drug charges. In April 1984, several weeks before the murder, the court released Mills on bail, and she arranged to meet Trent at his apartment. In his usual practice, Trent greeted Mills with a gun in hand and they immediately consumed cocaine. Impressing Mills with his power in the community, Trent offered help in at least two ways. First, he referred Mills to the law firm (Foley, Colton and Duncan, P.A.) that represented him. Second, he discussed having her serve as an informant with the local police.

---

1. We borrow much of the factual and collateral review background information verbatim from the panel's opinion. *See* Freund v. Butterworth, 117 F.3d 1543, 1547–70 & nn. 1–60 (11th Cir. 1997), *vacated,* 135 F.3d 1419 (11th Cir.1998) (granting the State's suggestion for rehearing *en banc* ).

2. These three persons also testified at Trent's trial, which preceded Freund's trial. Trent and Freund did not testify at either trial.

### 4. Lisa Angelilli

Mills's daughter, Lisa Angelilli, also testified at Freund's trial. At the time that Mills and Trent became associated, Angelilli was sixteen years old.[3] Like her mother, she frequently used drugs. Mills told Angelilli about Trent. She anxiously awaited the opportunity to meet and use drugs with a man of his influence.

### 5. Bill Daniell

Bill Daniell was the third material witness at Freund's trial. An ex-convict, Daniell worked at House of Draperies as an electrician and performed several "odd jobs" for Trent, including drug trafficking. He had known Trent for over thirteen years, and Trent often introduced him as his bodyguard and "hit man."

### 6. Ralph Walker

Finally, Ralph Walker was the stabbing victim. Walker performed various tasks for Trent. He obtained drugs for Trent, collected rent on various properties that Trent owned and assaulted whomever Trent wanted harmed. Like Trent, Walker had a violent temperament.

### B. The Murder [4]

### 1. Preceding Events

Most of the events surrounding the murder of Walker occurred at Trent's Palm Beach Hotel apartment. Sometime in the afternoon or early evening of Tuesday, July 24, 1984, Mills and Angelilli arrived at Trent's apartment.[5] Trent had invited Mills and Angelilli to come over so that he could use cocaine with them and meet Angelilli. Of course, Trent answered the door with his .45 pistol in hand. The entrance to the apartment was through the bedroom. A hallway led from the bedroom to a dining room and living room area (the "main room")

that the kitchen adjoined. In the main room, they spent the next several hours consuming cocaine. Trent also drank bourbon. He remained armed with the .45 in a shoulder holster; a .357 magnum pistol also lay on the table where they sat.

Later in the evening, Angelilli announced that she wanted marijuana. Eager to impress Angelilli, Trent called Walker and told him to bring marijuana to the apartment. About thirty minutes later, Walker arrived. The party continued: all four snorted cocaine; Angelilli and Walker smoked marijuana; Trent drank bourbon; and Walker drank tequila. Walker drank and snorted more than the others.

At some point, Trent and Walker started to discuss past exploits. Trent and Walker became increasingly loud. The escalating level of tension made Mills very nervous. Between 10 p.m. and 11 p.m. that night, Walker whispered to Angelilli that he wanted to have sex with her. When she ignored him, he got upset, jumped around and yelled obscenities at her. Mills implored Trent to calm Walker down, but Trent assured her that Walker was just "playing around."

Walker, however, became more enraged. He retrieved an aluminum baseball bat from Trent's bedroom and slammed it onto the table. Walker announced to everyone that he was going to have sex with Angelilli, and that Trent would just have to ignore it. Walker then picked up the .357 magnum from the table and moved toward Angelilli with the gun in one hand and the bat in the other. Angelilli and Mills became frightened and tried to hide behind Trent. Trent knocked the .357 magnum out of Walker's hand. When Walker reached for the .45 in Trent's shoulder holster, Trent pulled it out first and fired it toward Walker. Walker dived over a couch. The bullet hit a dining room chair, but missed Walker. Trent

---

3. At the time she testified in court, Angelilli was eighteen years old.

4. We derive the following factual account of Walker's death from the testimony of Mills, Angelilli and Daniell at Freund's trial. We note where their testimony conflicted. In light of Freund's conviction, however, we must view

their trial testimony in a light most favorable to the State.

5. The exact time of arrival is unclear. Mills initially told the police that they arrived at 3 p.m., but she testified at trial that they did not arrive before 6 p.m. Angelilli testified that they arrived at 4 p.m.

walked around the couch, pointed the gun at Walker's head and threatened to kill Walker.

Keeping the .45 pointed at Walker, Trent instructed Mills to get a pair of handcuffs out of his kitchen closet. As Mills retrieved the handcuffs, she noticed that the closet contained guns, knives and pills. Trent instructed Mills to hold the gun while he handcuffed Walker's hands behind his back. Trent then told Angelilli to bring him the Gerber fighting knife from the closet. With the knife in one hand and gun in the other, Trent proceeded to kick Walker, lunge at (but not stab) him with the knife and repeatedly yell threats, including "You're dead Ralph Walker! You're dead ... and you're goin' home to your mama in a box." He also gagged Walker with a towel and strapped duct tape around Walker's mouth.

At this point, Freund entered the picture. Trent called Freund, Daniell and Bruce Fullerton, another one of his henchmen, for assistance. Trent asked Freund to come over with his "little black bag" to sedate Walker. Trent told Daniell to come over and bring his "piece." He instructed Fullerton to bring a steamer trunk, a sledge hammer and a chain saw. Freund and Daniell followed Trent's instructions, but Fullerton ignored them.

Freund arrived first, about fifteen minutes after the phone call. To sedate (but not kill) Walker as Trent ordered, Freund injected Walker with magnesium sulfate from his bag.[6] Daniell arrived shortly after Freund, while Freund was still injecting Walker.[7] When Daniell got close to Walker, he heard him mumble through the duct tape, "Don't let them kill me." After multiple injections, Freund ran out of magnesium sulfate. Walker was still conscious.

Trent found some diazepam in his kitchen closet.[8] He gave it to Freund along with a bottle of vodka. Freund crushed the pills into a powder that he dissolved in the vodka. Freund, Trent and Daniell all took turns injecting Walker with the mixture. After an injection, Walker would lose consciousness for a short time. When he revived, they would inject him again.

These gruesome events overcame Mills and Angelilli, who retreated from the main room to Trent's bedroom. They could still hear Walker groaning in agony, and they begged Trent to let them leave. Trent refused, but he and a hotel doorman escorted them to another apartment within the hotel. Approximately twenty minutes later, when Mills and Angelilli returned, Trent told Mills, "We had to take him out. He knows too much and we had to run an air bubble to his vein."

Freund and Trent had indeed injected air into Walker, but it did not kill him. Freund expressed his surprise to Daniell and Trent that the air injections had not caused an embolism. After watching Freund and Trent repeatedly pull the plunger all the way out of a syringe stuck in Walker's arm and pop the plunger back in to the hilt, Daniell decided that he could not watch anymore and joined the women in the bedroom. Freund stayed in the main room with Walker, while Trent split time between the main room and the bedroom.

## 2. The Stabbing

From the bedroom, Daniell saw Freund pick up Trent's Gerber fighting knife as if "he had found a new toy" and walk in the direction of Walker. Trent entered the bedroom. Daniell asked him what Freund was doing, and Trent replied that Freund "was probably fucking Ralph in the ass."[9]

---

6. Magnesium sulfate is a mild muscle relaxer. Oncologists frequently use this drug to treat symptoms arising from chemotherapy and to replenish the body with magnesium that is lost during the therapy.

7. Daniell was sober when he arrived, but soon joined Trent, Mills and Angelilli in consuming cocaine. Freund did not use cocaine at Trent's apartment that night. The record does not reveal whether Freund used cocaine, or any other intoxicant, before he arrived.

8. Diazepam is a drug that is used to counter the effects of anxiety and alcohol withdrawal.

9. At Freund's trial, the court instructed the jury to disregard as hearsay Daniell's testimony recounting this statement. We quote Trent's out-of-court statement not for the "truth of the matter" that he asserts, but to point out that Trent was not in the main room when Freund stabbed Walker, and that Trent expressed no knowledge to Daniell that Freund was killing him. Fla. Stat. § 90.801(1)(c) (1998).

At one point, Angelilli walked to the bathroom. On her way, she could see into the main room. Although she could not see Walker because he was on the floor behind the couch, she could see Freund. Freund had the knife in his hand. He was laughing and making up-and-down stabbing motions behind the couch. Although Angelilli apparently could not see where the knife landed, she was positive that Freund was stabbing Walker. Horrified, Angelilli ran into the bathroom and vomited before returning to the bedroom.

Shortly thereafter, when Trent, Daniell, Mills and Angelilli were in the bedroom, Freund walked into the room with blood on his shirt and said, "It's over." Trent told Freund that he could not leave wearing the bloody shirt and instructed him to change into one of Trent's shirts. After washing his hands and putting on a clean shirt, Freund started to leave. Freund warned Mills and Angelilli that they had not seen him that night. On his way out the door, he told Trent, "It was a pleasure doing business with you. Call me again." He telephoned about twenty minutes later to inform Trent that he had arrived home safely. Trent let Mills and Angelilli go home. Daniell stayed with Trent through the next morning. At one point, Daniell saw Walker's body in the living room in a pool of blood.

### 3. Disposing of Walker's Body

The next day, Wednesday, Daniell drove Trent to House of Draperies to pick up Trent's van. They drove the van to the Palm Beach Hotel to retrieve Walker's bicycle that he had left in front of the building. After unloading the bicycle at House of Draperies, Trent and Daniell drove to the apartment of one of Trent's girlfriends. They made arrangements for the girlfriend and Fullerton to purchase a steamer trunk that they would use to remove Walker's body from Trent's apartment.

Later that day, Mills picked Trent up from House of Draperies and drove him to the Palm Beach Hotel apartment. Fullerton

soon joined them, and the three began to clean up the apartment. They, however, left Walker's body on the floor behind the couch. Trent and Fullerton discussed removing the body in a steamer trunk. Freund arrived at the apartment around 2 a.m. Thursday morning. Trent, Freund and Mills sat around the dining room table snorting cocaine, drinking and talking for several hours. They discussed how to dispose of Walker's body. During the entire night, Freund acted oblivious to Walker's corpse that sprawled close to the dining room table. Freund left the apartment sometime early Thursday morning.

The body remained in Trent's main room throughout much of Thursday. During this time, Trent threatened to kill Mills and Angelilli if they said anything to the police. He also reminded them that he had the local police under his control. Similarly, Trent threatened to kill Daniell's family if he did not help Trent conceal the body. At one point, Trent told Angelilli that Walker had deserved to die because he knew too much.

Late Thursday afternoon, after Freund and his friends left the apartment, Fullerton arrived with a sledgehammer and a steamer trunk that he had purchased with Trent's girlfriend. Trent used the sledgehammer to break Walker's legs so that his body would fit in the trunk. Once Trent closed Walker's body in the trunk, Trent, Fullerton, Mills and another friend of Trent carried it to Trent's van and drove to House of Draperies.

### C. Police Investigation

### 1. Mills's and Angelilli's Cooperation and the Police's Searches

The morning of Saturday, July 28, 1984, Mills and Angelilli decided to call the police.[10] They related the events surrounding the stabbing and told the police where to find Walker's body. They did not tell the police about Daniell's involvement. Later that day, the police discovered Walker's body in Trent's van at House of Draperies, beginning their investigation.

---

10. They called the vice squad officer who had arrested Mills on cocaine trafficking charges. They chose him because Trent had earlier told

Mills that he did not trust that officer. They thus thought that he was unlikely to be under Trent's influence.

Also, based on Mills's and Angelilli's statements, the police obtained and executed search warrants for House of Draperies and Trent's Palm Beach Hotel apartment. At House of Draperies, the police found: Walker's badly decomposed body in the steamer trunk in Trent's van; boxes of empty beer cans and liquor bottles; trash bags containing syringes, needle wrappers, empty drug capsules and four empty ampules of magnesium sulfate. They also discovered Trent's and Fullerton's fingerprints on the van.

At Trent's apartment, the police found: duct tape; a loaded .45 pistol in a shoulder holster; a loaded .357 magnum pistol; a pair of handcuffs; bottles of diazepam that Freund had prescribed for Trent; a sledgehammer; a dented aluminum baseball bat; a dining room chair with a bullet lodged in it; a Gerber fighting knife with human blood on the blade; a bag of blood-soaked towels; and an empty beer can with Mills's fingerprints.

### 2. Autopsy

Shortly after the searches, the coroner performed an autopsy on Walker's body. The coroner found five stab wounds straight into Walker's chest and one into his lower back that extended upward and inward toward the heart. The coroner concluded that these stab wounds penetrated Walker's heart and, therefore, caused his death. The coroner also noticed handcuff injuries to Walker's wrists and duct tape over his mouth. Walker's body fluids revealed high levels of cocaine, alcohol and a derivative of diazepam. The corner did not find any needle marks, but advanced decomposition in one area suggested that Walker may have received multiple injections.

### 3. Trent's Flight and Daniell's Cooperation

After the police discovered Walker's body, Trent fled to Illinois. Daniell eventually approached the police about his involvement

and corroborated Mills and Angelilli's story. In addition to the physical evidence found at Trent's apartment and House of Draperies, the police had three material witnesses willing to testify about Walker's murder. The State Attorney's Office did not charge Mills, Angelilli or Daniell with any crime resulting from their involvement in the murder or disposition of Walker's corpse.[11]

### D. The Law Firm

For thirteen years, Trent had extensive dealings with the law firm of Foley, Colton and Duncan, P.A. (the "law firm")—the law firm that would eventually represent Freund at trial. In the early 1970s, Robert Foley began representing Trent in various criminal and civil matters, as did Roger Colton and Douglas Duncan after they joined the law firm. Overall, until May 1984, the law firm represented Trent in various cases and capacities ranging from civil collection actions involving House of Draperies and Trent's hotels to criminal matters.[12] Additionally, during this time, the law firm and Trent's relationship often exceeded that of attorney and client. Trent and his employees came to the office on a daily basis, sharing the law firm's copier and other office equipment. Trent also performed interior design work for the law firm, Foley, Colton, and Duncan's parents.

Trent referred many of his employees and friends, including Mills, to the law firm. Approximately two months before the stabbing, Mills met with Colton at Trent's Palm Beach Hotel apartment for less than an hour and explained to him the facts and circumstances of her cocaine trafficking charge. Colton and Mills discussed the possibility of her providing assistance to the police. Colton and Mills's professional relationship began and ended with this meeting.[13]

---

**11.** The State Attorney's Office did, however, delay Mills's cocaine trafficking case until after the conclusion of Freund's trial. The record does not indicate whether the State Attorney's Office ever resumed that prosecution.

**12.** In addition to representing Trent, the law firm represented Trent's mother's estate. Freund,

however, does not allege any conflict of interest stemming from that representation.

**13.** Also, prior to 1988, Trent referred Daniell to the law firm for representation on a traffic violation for speeding.

The law firm represented Trent until May 1984, approximately three months before the stabbing. A year earlier, on June 19, 1983, Trent allegedly brandished a gun on a public street and threatened to kill two persons. The alleged facts were that Trent was speeding recklessly through a residential area and screeched to a halt. A woman with the last name of Vana came out of her apartment fearing that Trent had struck a neighborhood child. Vana asked Trent why he was driving like that and told him that small children played in the area. Trent told her to mind her own business or she would get hurt. When Vana's husband approached, Trent pulled out a handgun from a holster in his waistband and asked her if she "wanted this one or the other," motioning to a gun that he supposedly had in his back waistband area. A few days later, advised of the assault incident, the police stopped Trent in his car. The officers discovered diazepam in Trent's possession. The police arrested Trent for, and the State Attorney's Office charged him with, possession of diazepam and aggravated assault. The State also initiated a forfeiture proceeding against Trent's automobile in relation to the possession charge.[14]

The law firm, primarily Colton, initially represented Trent in both the aggravated assault and diazepam possession prosecutions, but it withdrew as counsel no later than May 2, 1984, prior to their resolutions. The Honorable Marvin Mounts, Palm Beach County Circuit Judge, presided over these prosecutions. Colton and Duncan also represented Trent in the forfeiture proceeding, also before Judge Mounts, through final judgment that issued prior to May 1984.

Although Trent had retained David Roth as substitute defense counsel in his aggravated assault and diazepam possession cases, he

called Colton from Illinois after the stabbing for advice. Trent did not discuss the facts of the murder, and Colton offered no advice other than suggesting that Trent was in a lot of trouble and he should surrender to the authorities. Roth continued to represent Trent throughout his murder trial.

Freund went to the law firm for advice soon after the stabbing.[15] At that first meeting, Freund confessed to Foley that he stabbed Walker to death. The law firm agreed to defend him, and Freund surrendered to the authorities on July 31, 1984. Ten days after Freund's arrest, authorities arrested Trent in Illinois. The court detained Trent and Freund without bail, and on August 23, 1984, a grand jury indicted both for the first-degree murder of Walker.[16]

### E. Prosecution of Freund and Trent

#### 1. Press Conference

Two or three days after the court arraigned Freund, Foley called a press conference to announce that Freund would rely on an insanity defense. Formally, however, the law firm did not file a notice of intent to rely on the insanity defense until nearly a year later, June 4, 1985.[17] By that time, Freund had admitted not only to Foley, but also to Duncan that he killed Walker. Freund had also told his psychiatrist that he stabbed Walker because Trent told him to do it.

#### 2. Discovery and Freund's Motion to Sever

The clerk of court assigned Trent and Freund's murder case to Judge Mounts, the same judge who had earlier presided over Trent's assault, drug possession and forfeiture proceedings. After several hearings to

14. We derive these facts only from Freund's petition for writ of habeas corpus. Freund never proved these facts at any hearing.

15. The record does not reveal who, if anyone, recommended the law firm to Freund.

16. Specifically, the indictment alleged that Freund and Trent "did unlawfully from a premeditated design to effect the death of a human being, kill and murder RALPH WALKER, a human being by stabbing the said RALPH WALK-

ER with a knife or other sharp instrument, contrary to Florida Statute 782.04(1)(a)."

17. In fact, around the time of the press conference, on September 7, 1984, the law firm filed a "Motion to Extend Time for Filing Notice of Intent to Rely on the Defense of Insanity," contending that it was "not presently in a position to state with particularity if [Freund] ... was insane at the time of the alleged offense ..., and if so the nature of the insanity." The court apparently granted the motion.

determine Freund's competency to stand trial, Judge Mounts declared him competent on February 5, 1985. Soon thereafter, two conflict-of-interest issues arose during pretrial proceedings.

The first conflict issue arose at a deposition on April 16, 1985. Mills refused to answer any questions that Duncan asked on the ground that her prior consultation with Colton regarding the cocaine trafficking charge had established an attorney-client relationship with the law firm. Mills, however, had already disclosed to Trent's lawyer, Roth, in Duncan's presence any information that she had conveyed to Colton during that consultation. Nevertheless, Mills remained silent.

The second conflict issue arose less than a month later. On May 13, 1985, the law firm filed a motion to sever on behalf of Freund, asking the district court to order the State Attorney's Office to prosecute Freund and Trent in separate trials.[18] As grounds, the law firm averred that

[t]here exists a concern that because DR. FREUND's attorneys have represented MR. TRENT in the past and on unrelated matters to the instant case, that there may be a potential conflict. Specifically, if in a joint trial, MR. TRENT[ ] was to testify in his own behalf, his former attorneys would be in a position of cross-examining him.... [A] severance should be granted ... to avoid even the remotest scintilla of an appearance of impropriety. This is not to say that an appearance of impropriety exists.

The law firm concluded the motion with a statement that it was requesting an informal written opinion addressing the possible conflict from the Florida Bar. Although Judge Mounts eventually severed Freund's and Trent's trials, the record does not disclose whether he ever issued a ruling on this (Freund's) motion.

### 3. Florida Bar Opinion

Duncan wrote the letter to the Florida Bar on the same day that the law firm filed the motion to sever. After providing a factual background, Duncan asked two related questions about the law firm's prior representation of Trent.[19] First, Duncan essentially conceded that the law firm would have to withdraw from representing Freund if the court tried Freund and Trent jointly:

[T]here may an appearance of impropriety under [Florida's rules of professional conduct] in being up against a former client. Specifically, if in a joint trial, Mr. Trent elects to testify on his own behalf, ... his former attorneys[ ] would clearly be put in a position of cross-examining him.... [I]t may in the eyes of some raise the appearance of impropriety.

But because he believed that severance was "likely," Duncan asked

whether ... there are any ethical problems in arguing in defense of Dr. Freund that at the time of the alleged homicide he was obviously insane, and this insanity was known by Mr. Trent, and accordingly Mr. Trent manipulated Dr. Freund to commit the murder for he, Trent. Simply stated, is there anything ethically wrong with arguing in a separate trial, that a former client [Trent] is responsible for a homicide as opposed to the new client [Freund].

As to Mills's refusal to answer questions that the law firm posed on behalf of Freund,

---

18. This motion was actually the second such motion that the law firm filed on Freund's behalf. In its initial motion dated February 21, 1985, the law firm sought a severance because of an out-of-court statement that Trent made to the media. Trent announced on television that he saw Freund kill Walker. The law firm argued that the admission of Trent's out-of-court implication of Freund in a joint trial where Trent did not testify would violate Freund's constitutional right to confront his accuser. *See Bruton v. United States*, 391 U.S. 123, 135–36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). After a hearing, Judge Mounts ruled that he would grant the severance if the prosecution intended to use the statement at trial. Because Judge Mounts did not grant a severance based on this motion, we assume that the prosecution repudiated any intention to use it.

19. In his letter, Duncan proceeded under the assumption that the law firm's representation of Trent and Freund was successive, as opposed to simultaneous. Further, Duncan premised that "[c]learly, the prior representations of Mr. Trent are in no way connected to the instant homicide."

Duncan inquired whether "there [is] anything by virtue of the one initial consultation with Ms. Mills, that would preclude my law firm from examining and questioning Ms. Mills concerning her knowledge of the homicide[.]"

Duncan received an advisory staff opinion from the Bar on May 31, 1985 (the "Bar opinion"). Regarding the law firm's prior representation of Trent, although the Bar opinion did not offer a direct answer to either question that Duncan advanced, it did outline some relevant considerations:

> [W]here the matter [for which the attorney represented the former client] is so unrelated, as to either substance or time, that the attorney could not have acquired information [from] the former client which could be used to his detriment, the attorney may ethically undertake representation adverse to his former client. If such related information was acquired during the course of former representation, [the rules of professional conduct] would prohibit the proposed representation even if a severance of the former and present clients' cases were granted. Therefore the responsibility of the former client in the present case could only be argued where no detrimental information was obtained in the previous distant or unrelated representation.

As to whether the law firm could question Mills about the homicide, the Bar opinion suggested that it could as long as its questioning did not reveal any secrets or confidences between the law firm and Mills. As it did with Trent, the Bar opinion cautioned that if Mills's consultation with the law firm was either close in time or related to the homicide, the law firm could not ethically question Mills concerning the homicide.

On June 3, 1985, relying on the Bar opinion, Duncan moved the court to order Mills to submit to the law firm's deposition. Duncan assured Judge Mounts that the law firm would "maintain the confidences and secrets that may have been disclosed by Ms. Mills to Mr. Colton during their initial consultation

on the unrelated criminal charge." He went on to state that because the murder occurred after the consultation, the law firm's prior relationship with her would not prohibit it from questioning Mills about her "observations and opinions concerning the alleged homicide." Mills submitted to the law firm's deposition on June 24, 1985.

### 4. Severance Hearing

While Freund's motion to sever was still pending, on August 20, 1985, Trent filed his own motion to sever on two different grounds. Through discovery, Trent's lawyer, Roth, learned that Freund had confessed to his psychiatrist that although Freund stabbed Walker, Trent made him do it. Thus, the first ground of Trent's motion was that if Freund chose not to testify, the admission in a joint trial of Freund's out-of-court confession that inculpated Trent would violate Trent's rights under the Sixth Amendment's Confrontation Clause. *See Bruton v. United States*, 391 U.S. 123, 135–36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Judge Mounts ruled that to avoid a *Bruton* problem, he would simply exclude this statement if Freund and Trent were tried jointly.

Trent's second ground for severance involved the law firm's relationship with him. Trent alleged that the law firm had acquired confidential information that it could use against him at a joint trial. Despite his own pending motion to sever, Freund initially joined the State in opposing Trent's requested severance.[20]

Judge Mounts conducted a hearing on Trent's severance motion on September 3, 1985. The court opened the hearing to the public, and it drew significant media attention. The first witness that Roth called to the stand was Trent. Trent initially detailed the attorney-client relationship that had developed between the law firm and himself. Trent testified that during the course of the representation, he had confided his personal secrets and business affairs to both Foley and Colton. Trent told the law firm about his participation in multiple criminal activi-

---

**20.** In fact, a few days before the hearing, the State Attorney's Office and Foley, on behalf of Freund, stipulated in writing that "no legal grounds exist for the granting of the severance" and that the court should try both Freund and Trent together.

ties involving drugs and prostitution. Even after Trent had retained Roth to handle his drug and assault prosecutions, he called Colton from Illinois after the stabbing. Trent explained that at the time of the telephone call, he still considered Colton to be his attorney.

Trent's testimony then moved from his professional relationship with the law firm to a more personal and lurid relationship. He had considered Foley and Colton to be close friends in addition to his lawyers. Beyond discussing his criminal activities, Trent would recount to both lawyers the details of his sexual exploits. Trent even showed Foley and Colton a number of "sexual devices," including whips, chains and handcuffs, at his Palm Beach Hotel apartment. Trent also contended that he used cocaine in Foley's and Colton's presence, including in their law offices.

According to Trent, Foley and Colton did more than just listen to Trent's tales of deviancy. Trent made several serious allegations against both lawyers. First, he claimed to have delivered cocaine to their friends, sometimes at the law firm. He further suggested that he had provided both lawyers with prostitutes on many occasions, often as payment for legal services. Indeed, Trent allegedly provided Foley with "so many [prostitutes] over the years ... it [was] almost a daily occurrence." He alleged that the two attorneys had attended and participated in many of his "sex parties" involving cocaine and prostitutes. For example, on one occasion, Trent and Foley allegedly invited several prostitutes to the offices after the close of business. One of them accidentally tripped the police-monitored burglar alarm. When the police arrived, Trent recounted that he had to answer the door because Foley was naked.

After Trent concluded his testimony, Roth called Colton to the stand. Colton "categorically[,]" "unequivocally and totally" denied "each and every accusation" that Trent had levied.[21] To avoid being forced off of the case, Foley did not cross-examine Colton or testify. Although both Duncan and the assistant state attorney declined to examine Colton, the court did question him, eliciting that Colton was an upstanding member of the Florida Bar, enjoyed a solid reputation for fairness and professionalism, and had served on several bar committees involving issues ranging from legal ethics to judicial appointments.

During arguments that followed the conclusion of testimony, Duncan announced that Freund was joining Trent's request for a severance. Duncan's reason for changing his mind was not Trent's inflammatory allegations against the law firm. Rather, Duncan feared that the court's exclusion of Freund's out-of-court confession to his psychiatrist in a joint trial would completely gut the law firm's theory of the case, that is, that Trent controlled Freund and ordered him to kill Walker. Roth's only problem with a joint trial, in contrast, was the law firm's cross-examination of its former client "if and when Trent takes the stand." Ultimately, Judge Mounts granted the severance.

#### 5. Trent's Trial

The court tried Trent first. Duncan attended the trial and observed the testimony of Mills, Angelilli and Daniell, the three principal fact witnesses for the State. Neither Freund nor Trent testified. The trial resulted in a hung jury, and the court declared a mistrial. In a plea bargain, the State Attorney's Office reduced the first degree murder charge in exchange for Trent's pleading guilty to second-degree murder. The court sentenced Trent to a 17-year sentence, and prison authorities have since released him.[22]

21. The following exchange between Roth and Colton took place:
> Q. You have heard all this testimony from Mr. Trent?
> A. Yes.
> Q. In reference to, what you and I think we can discuss, other than legal issues? To some of the accusations made, do you deny those accusations?

> A. I deny each and every accusation Mr. Trent has stated about me and I deny them uncategorically, unequivocally and totally.
> THE COURT: Categorically.

22. The record does not contain the transcripts of Trent's trial. Nor does the record reveal any further direct involvement on Trent's part in Freund's prosecution.

### 6. Freund's Trial

After Trent pleaded guilty to second-degree murder, the State Attorney's Office offered the same deal to Freund. The law firm advised Freund that the defense of insanity was successful 30 percent or less of the time. Rejecting the offer on behalf of Freund, Foley stated to the assistant state attorney that the defense was holding out for a verdict of manslaughter or not guilty by reason of insanity. Thus, the State brought Freund to trial on October 23, 1985, and Duncan and Foley served as his trial lawyers.

#### i. State's Case–in–Chief

The State first introduced most of the physical evidence through the testimony of various police officers who conducted the investigation. The prosecution also presented the results of Walker's autopsy through the testimony of the conducting pathologist. He confirmed that although Walker's body fluids revealed high levels of cocaine, alcohol and a derivative of diazepam, stabbing caused Walker's death.

Through the testimony of Mills, Angelilli and Daniell, the State presented the details of the murder. With only minor inconsistencies, the three witnesses essentially recounted the events leading up to and following Walker's stabbing as described in section I, part B, of this opinion. They all testified that Freund was present at Trent's apartment the night of the murder and that, at Trent's direction, he injected Walker first with magnesium sulfate, then with mixtures of vodka and diazepam, and finally with air.

Angelilli testified that Freund made stabbing motions in the direction of Walker's body. Because Walker's body was behind a couch, Angelilli conceded that she did not see the knife actually strike Walker's body. Daniell testified that he saw Freund pick up Trent's knife and approach Walker. All three witnesses testified that Freund was alone in the main room with Walker for a short time, and that afterward he came into the bedroom with blood on his shirt. After describing their roles in cleaning up and moving Walker's body, the witnesses each concluded their direct testimony through recounting how and why they went to the police.

Duncan brought out many of the inconsistencies of each witness's testimony on cross-examination. For example, he elicited from both Mills and Angelilli that when they originally went to the police, they omitted altogether any mention of Daniell. Mills and Angelilli explained that they were afraid to inculpate him because they thought he was a hit man who would kill them. Only after Daniell went to the police did Mills and Angelilli acknowledge his presence at the murder scene.

While cross-examining Mills, Duncan asked a series of questions about how she came to know Trent and about her prior arrest for trafficking cocaine. Duncan had her recount the basic background of that pending charge and Trent's assistance from shortly after her arrest until her one and only meeting with Colton. Duncan stopped short of asking Mills about her consultation with Colton.[23] Mills also admitted that she,

23. Specifically, Duncan questioned Mills as follows:

Q. You testified to this jury that you heard of or you learned about John Trent while you were in the Palm Beach County jail?
A. Yes.
Q. Through a Rosemary Lail?
A. Yes.
Q. Okay. And what Rosemary Lail told you was, "Listen, you're looking at some big time and a fine and the guy you want to see in town is John Trent"?
A. Yes.
....
Q. And you had been arrested, I think you told the jury, for trafficking in cocaine?
A. Yes.

Q. You tried to sell some police officers cocaine?
A. I was like the middle person.
Q. Okay. How much cocaine were you trying to sell?
A. Four kilos. That's what he requested, [the police officer] requested and he received one kilo.
Q. How much is a kilo of cocaine, Ms. Mills?
A. Two pounds.
Q. I'm sorry, the price?
A. The price? About thirty-seven thousand I think the price was.
Q. That's what you were selling it for, thirty-seven thousand?
A. Yes.
Q. And you told this jury that you understood that what you had been arrested for carried

like everyone else except Freund, used cocaine on the night of the stabbing.

On cross-examination of each of the three witnesses, Duncan elicited personal facts in an effort to impeach their credibility. For instance, he questioned Mills about "Port O Call for Men," the escort service she ran. Similarly, when cross-examining Angelilli, Duncan elicited that just prior to the trial, she had worked as a topless dancer. And, Daniell admitted on cross-examination that he was an ex-felon and attested that he "would never go back to prison except on a slab."

### ii. Freund's Insanity Defense

After the prosecution rested its case, Duncan and Foley presented Freund's insanity

with it a fifteen year mandatory minimum sentence?

A. Yes.

Q. You understood that if you were guilty and convicted of that, that you would do day for day fifteen years?

A. Yes.

Q. You were also aware that that carried with it in addition to the fifteen years a quarter of a million dollar fine?

A. Yes.

Q. So as a result of your conversation with Rosemary Lail, you were looking forward to meeting this guy who was going to get you out of a fifteen year prison sentence and a quarter of a million dollar fine?

A. I wasn't sure he was going to get me out.

Q. I understand that. But you certainly were going to check it out?

A. I was going to check it out, yes.

Q. In fact the first time you got out of jail, John Trent sent a cab for you, didn't he?

A. Yes.

Q. And he paid for the cab to bring you to the Palm Beach Hotel?

A. Yes.

Q. Tell the jury, Ms. Mills, the first thing that you said and did when you arrived at John Trent's apartment the day you got out of jail in the cab that he paid for.

A. I went into the apartment. Rosemary Lail was there, John Trent was there and the first thing he did was lay out some cocaine.

Q. You did it?

A. Yes.

Q. The first thing off the bat?

A. Yes.

Q. The moment you get out of jail ... you're doing cocaine?

A. Yes.

Q. And did John Trent then begin to talk to you about a term we use down here in the courthouse, "substantial assistance"?

A. I don't know if he mentioned that term or not but he did say he could help me.

Q. Okay. He may not have used the legal terminology, "substantial assistance," but he explained to you, "Listen, Eleanor or Ms. Mills," whatever he called you, "the only way you're going to get out from under this fifteen year mandatory minimum sentence and a quarter of a million dollar fine is to work with me"?

A. That's what he said, yes.

Q. Okay.

A. He needed help also.

Q. What do you mean he needed help?

A. He was an informant. He was an informant for the law so he needed something too. He needed some assistance also. It would help him and Rosemary Lail and myself.·

. . . .

Q. Okay. You talked about what it was though, substantial assistance, whereby you would work with the police to set somebody up?

A. We talked about it, yes.

Q. Well, you talked about the mechanics of it?

A. Yes.

Q. You would set somebody up, get them involved in a drug deal?

A. No. He was going to set someone up?

Q. He, being who?

A. John Trent.

. . . .

Q. But the mechanics of it, Ms. Mills, and correct me if I'm wrong, was that John Trent using you would set somebody else up in a drug deal and they would get arrested and then you would help the Prosecutor and the State and you would get out of your problem?

A. That's what he was saying.

Q. Okay. Now, John Trent told you that he had what, the West Palm Beach Police Department in his back pocket?

A. Yes.

Q. That he had the Palm Beach Police Department in his back pocket?

A. Yes. He had them all. He said he had a good rapport with them.

Q. Okay. And John Trent set himself up to you as being the big man?

A. Yes, he did.

Q. He could control things?

A. That's how it came off to me, yes.

Q. The first day you came out of jail and went there, he told you, "Don't worry about it, Ms. Mills, I'm going to handle things for you"?

A. Yes.

Q. That was a great relief to you, wasn't it, ma'am?

A. No. Because I listened him but I told him that I didn't believe it until I seen it.

Q. But you weren't the least bit relieved or encouraged that you were going to get out of this fifteen year mandatory sentence and quarter of a million dollar fine with what he said he was going to do for you?

A. I felt more comfortable, yes.

defense. Through the testimony of several witnesses, they demonstrated that Freund had a good reputation as an oncologist before his suicide attempt. They developed the facts surrounding the suicide attempt, focusing on the changes in Freund's personality that brain damage had caused. Colleagues of Freund testified that he seemed to be a different person with severe memory problems. The defense also presented the testimony of several experts who explained the symptoms of brain damage, including susceptibility to suggestion and a lack of independent judgment. Many of these experts had evaluated Freund shortly after his suicide attempt to determine whether or not he was fit to return to the practice of medicine.

During its cross-examination of Freund's witnesses and through the testimony of the witnesses it called on rebuttal, the prosecution attempted to demonstrate that Freund knew what he was doing when he stabbed Walker and knew that it was wrong. When cross-examining one of the psychiatrists who Foley called, the State elicited that Freund had told the psychiatrist that he remembered the events of the night of the murder. Specifically, the jury heard the psychiatrist confirm that Freund had admitted to remembering the following: Trent called him to come over and kill Walker. When he arrived at Trent's apartment, Walker was lying on the floor in handcuffs. He injected Walker with diazepam knowing that it would not kill Walker. He stabbed Walker several times with a letter opener. He did not know Walker's identity when he stabbed him. He first stabbed Walker in the back, but then turned him over to stab him in the heart because, as a doctor, he knew that was the way "to really kill a person that is in handcuffs."

Neither Duncan nor Foley objected to this line of questioning. Judge Mounts did instruct the jury, on more than one occasion, that Freund's statements to psychiatrists may be treated "as evidence of mental condition only and not as evidence of the factual truth" that they may contain. Freund did not testify.

### iii. State's Rebuttal

The prosecution called its own expert witness on rebuttal, a psychiatrist who the court had appointed to determine Freund's competency to stand trial. This psychiatrist opined that. Freund was feigning most of his mental problems. He claimed that although the stabbing may have been the result of an "irresistible impulse," Freund definitely knew that he was killing Walker and knew that what he was doing was wrong.[24] The witness also commented on the reports that psychiatrists who had examined Freund to determine his competency to return to the medical practice had prepared. He interpreted those reports as indicating that Freund's condition was improving and that Freund might have been able to return to the practice of medicine. He suggested that the psychiatrists who testified on Freund's behalf exaggerated his condition to support the insanity defense.

The last witness that the State called on rebuttal, and the last witness of the entire trial, was James Stob, a friend of Freund. Stob testified that Freund denied killing Walker when Stob visited him on jail. At no time did the State call Trent to testify.

### iv. Closing Arguments

The closing arguments focused on Freund's insanity at the time of the stabbing. The assistant state attorney argued that Freund knew exactly what he was doing and that he falsely tried to convince his psychiatrists that he was insane. Duncan focused on Freund's brain damage and the supporting testimony of psychiatrists, arguing that

24. Some states provide an insanity defense for crimes committed as a result of an irresistible impulse. *See* Model Penal Code § 4.01(1) (1995) (providing insanity defense where "as a result of mental disease or defect [the defendant] lacks substantial capacity to ... conform his conduct to the requirements of the law"). Florida law, however, permits the defense of insanity only where

at the time of an alleged crime a defendant was by reason of mental infirmity, disease or defect unable to understand the nature and quality of his act or its consequences, or if he did understand it, was incapable of distinguishing that which is right from that which is wrong.

*Wheeler v. State*, 344 So.2d 244, 245 n. 2 (Fla. 1977).

Freund either did not know what he was doing when he stabbed Walker or, if he did know what he was doing, did not know that it was wrong. Duncan asserted that two victims existed in the case, Walker and Freund. He argued that Trent knew that Freund's condition left him susceptible to influence and that Trent accordingly manipulated and controlled Freund like a robot, making him kill Walker.

At one point, Duncan turned the argument over to Foley. After contending that reasonable doubt existed as to Freund's sanity, Foley argued to the jury that Trent ordered Freund

> to do something. He did it, and because of the stressful situation, Ralph Walker is dead. We don't really know who did it. I always wondered whether Trent did it and told this poor guy, "You did it. My colleagues here are telling you you did it."
>
> The same girls were lying when they told the police they didn't even tell them about Daniell in the sworn statement. The woman is going to get fifteen years mandatory without parole lifted for her if she cooperates, but she lies, she is in trouble and she lied about Daniell and Daniell got the word and he figured he better get in on the train also so he runs down to the police station Tuesday, I think it was, after the murder, and gives his statement and they say okay.
>
> Remember, he lied about that so we don't know what happened there. We can't guess what happened. We can't guess this man into the electric chair and we can't guess him into 25 years in the penitentiary without parole.

Foley then returned to the insanity defense. In the State's final closing argument, in addition to refuting the insanity defense, it addressed Foley's statements: "Now, Mr. Foley tells you we are not even sure if Freund stabbed Walker. That's ridiculous."

25. The record before us does not include transcripts of the penalty phase.

26. Judge Mounts did not preside over the relevant state collateral review proceedings. Freund had successfully moved to disqualify Judge

### v. Verdict and Sentence

After receiving their instructions from Judge Mounts, the jury deliberated for a total of three hours over two days. On November 1, 1985, the jury returned a verdict of guilty of murder in the first degree. At a subsequent penalty phase, the jury recommended a life sentence through a vote of ten to two.[25] Judge Mounts accepted the recommendation and sentenced Freund to life in prison without the possibility of parole for twenty-five years, the minimum sentence that Freund could receive.

### F. Direct Appeal

The law firm represented Freund on direct appeal. On grounds unrelated to this appeal, both the Fourth District Court of Appeal and the Supreme Court of Florida affirmed Freund's conviction. *See Freund v. State,* 506 So.2d 437 (Fla.App. 4 Dist.1987) (*per curiam*), *aff'd,* 520 So.2d 556 (Fla.1988).

## II. COLLATERAL REVIEW PROCEEDINGS

### A. State Court

After his direct appeal failed, Freund obtained new counsel—the same lawyers who represent Freund before us—to attack collaterally his conviction in state and federal court. On March 29, 1990, Freund filed a motion to vacate the judgment and sentence, pursuant to Florida Rule of Criminal Procedure 3.850 (the "3.850 motion"), in the state circuit court that tried and sentenced him. Freund argued that the law firm's conflicts of interest denied Freund his constitutional right to the effective assistance of trial counsel. As sources of the conflicts, Freund pointed to the law firm's relationship with Trent and Mills. The court conducted an evidentiary hearing on April 25, 1991 (the "3.850 hearing").[26]

Mounts from resolving his 3.850 motion because of the judge's admitted "firm, fixed and select feelings and opinions about the credibility of" Trent.

### 1. Trent's Private Investigator

In his case-in-chief, Freund's counsel called two witnesses to the stand. The first witness was Thomas Dick. Dick was an auxiliary patrolman for the Riviera Beach Police Department and a friend of Trent. Dick testified that Trent asked him to investigate the background of Vana, the alleged victim of Trent's 1983 aggravated assault charge. Dick denied ever conducting any investigation, but admitted to obtaining the police report and meeting with Trent and Colton separately to discuss the case. Neither Trent nor Colton asked Dick to do any investigative work with respect to the diazepam possession charge.

Moving to the events following the stabbing, Dick testified that he learned that Trent was a fugitive in the murder investigation and that Freund had surrendered. Daniell went to see Dick shortly thereafter. Daniell told Dick that "he was [at Trent's apartment] when whatever happened happened." Dick convinced Daniell to turn himself in to the Palm Beach Police Department. At some point, while Trent was still in Illinois, Dick permitted the police to record calls made to Dick's residence. The police recorded several conversations between Dick and Trent over the next few days.

These recorded conversations that Freund played at the 3.850 hearing confirmed that Trent had contacted Colton following the stabbing. Trent also told Dick that he would arrange for Colton to pay Dick to do some investigatory work. Trent suggested that Colton possessed Trent's power of attorney over some of his assets.

After the tapes concluded, Dick testified that he had met with Colton following the calls from Trent. At that meeting, Colton denied to Dick that he enjoyed power of attorney over any of Trent's assets. Dick testified that although he assumed without doubt that Colton represented Trent in late July and August 1984, Colton never told him that he represented Trent. Dick last spoke with Trent on August 8, 1984, just prior to his arrest in Illinois.

### 2. Duncan

Duncan was the second witness that Freund's counsel called at the 3.850 hearing. With regard to the law firm's representation of Trent prior to May 1984, Duncan testified that although Colton handled most of that work, he did appear with Colton at Trent's forfeiture hearing before Judge Mounts. Duncan denied that the law firm simultaneously represented Trent and Freund. When asked about his reaction to Trent's allegations at the severance hearing, Duncan admitted that he was appalled and that the law firm was generally angry.

The bulk of Duncan's testimony, however, dealt with the law firm's representation of Freund. Duncan and Foley served as Freund's principal lawyers. In preparation for Freund's defense, Duncan observed Trent's trial. He stated that Trent's only defense was that he did not commit the murder. Duncan did not consider this defense to be completely consistent with the law firm's theory of the case that Trent, knowing of Freund's organic brain damage, orchestrated and manipulated Freund into stabbing Walker.

Duncan testified that, in his view, insanity was the only viable and plausible defense available to Freund. According to Duncan, the experts who testified on Freund's behalf were "some of the best and well known in their field." Additionally, the battery of psychiatric tests conducted after Freund's suicide attempt provided documented proof that his organic brain damage existed well before Walker's death. Finally, Duncan pointed out that Freund confessed to committing the stabbing to Foley at their first meeting and made similar confessions four or five months later to both his psychiatrist and Duncan.[27]

Duncan conceded that the State's physical evidence (e.g., the apartment, knife, handcuffs, gun, baseball bat, steamer trunk and location of the body) inculpated Trent, not

---

27. According to Duncan, Freund never recanted his confession to his lawyers or psychiatrist. During the four to five month period following his initial confession to Foley, Freund was on a suicide watch at the jail. Duncan stated that during this time, Freund would simply say that he could not remember what had happened on the night of Walker's death.

Freund. He further conceded that the coroner did not discover any magnesium sulfate (one of the drugs that Freund injected into Walker) in Walker's body at the autopsy, and that the police never found Freund's bloody shirt or the doctor's bag that he brought to Trent's apartment. When asked whether the State's three fact witnesses—Mills, Angelilli and Daniell—lacked credibility because of their admitted drug use and fear of Trent, Duncan testified that even under rigorous examination at Trent's trial they would not "back off what they claim they saw." This included Angelilli's testimony that she saw Freund making stabbing motions with Trent's knife in Walker's direction—testimony that directly implicated Freund.

Duncan disagreed with Freund's lawyer's suggestion that the law firm did not seek to shift the blame for the murder to Trent. He argued that although Freund's plea of insanity necessarily implied that Freund killed Walker, it was premised on Trent's taking advantage of Freund's known mental condition that rendered him a "robot" to Trent's unlawful commands. Duncan pointed to his cross-examinations of Mills, Angelilli and Daniell, where he sought to elicit facts about Trent's ability to control not only Freund, but also others.

Finally, when asked if Foley's statement during closing argument that Trent might have committed the murder hurt Freund's insanity defense, Duncan admitted that he was shocked when Foley made the statement and that it "sure didn't help" Freund's case. Duncan testified that he later asked Foley why he made the statement. Foley answered that he did it to "appease" Freund's mother.

### 3. Colton

After Freund presented Dick's and Duncan's testimony, the State called Colton to the stand as its first witness. Colton discussed the law firm's prior legal representation of Trent, focusing on the 1983 diazepam possession and aggravated assault charges. Colton corroborated Dick's account of Trent's requested investigation of the alleged assault victim. Colton emphasized that Trent substituted Roth for the law firm in May 1984

and asserted that Trent sought no further legal advice from the law firm about any matter after that date.

Colton also corroborated Dick's account of Dick's and Trent's contact with Colton following the stabbing. Colton testified that he never told Dick that he was Trent's lawyer. Rather, according to him, Colton "suggest[ed] strenuously" that Dick not get involved with Trent and that if Trent called Dick again, Dick should try to talk him into surrendering. Colton further testified that he told Trent that "his only alternative was to turn himself in, that [Colton] didn't represent him and [Colton] did not have an attorney-client relationship with him." Colton denied that he discussed the facts of the murder with Trent. At most, according to Colton, Trent may have said something to the effect of "I didn't do it," to which Colton replied, "you'd better turn yourself in." Colton also flatly denied the allegations that Trent had raised at the severance hearing.

When asked about the relationship between the law firm's representation of Trent and Freund, the State and Colton engaged in the following dialogue:

Q Okay. Was the representation of John Trent, your prior representation of him in any way connected with the facts of the homicide?

A No.

Q Did the facts of those cases have any bearing on the allegations of what had taken place on July 24th at the time of this murder?

A I don't know what you mean.

Q I mean was there any connection brought in to the court that somehow the murder was related to him being charged with the aggravated assault in 1983 or related to him being charged with guns in 1983?

A No ma'am.

With regard to Mills, Colton admitted that he had "consulted" her about the cocaine trafficking charge. According to Colton, he discussed the possibility that she would provide substantial assistance to the Palm Beach County Sheriff's Office. He insisted that the meeting with Mills was brief and that after

he quoted her a fee, he never saw her again in an official capacity.

Colton's testimony drew to a conclusion with the State's last question on direct examination. Freund's lawyer elected not to cross-examine Colton.

### 4. Assistant State Attorney

The prosecutor from Freund's trial also briefly testified at the 3.850 hearing as the State's second and final witness. The prosecutor recalled the letter that he received from Foley on October 3, 1985, wherein Foley indicated that the law firm believed it had "a unique, valid insanity defense and . . . a chance at getting a manslaughter jury verdict." Also, in the prosecutor's opinion, the law firm vigorously defended Freund at trial.

### 5. Expert Witness

The hearing ended with the rebuttal testimony of an expert in criminal defense law. He opined that the law firm's representation of Freund fell below the constitutional standard of effective representation because it presented conflicts of interest with the law firm's prior representations of Trent and Mills. The State's cross-examination of Tarkoff revealed that Tarkoff was not a board certified criminal lawyer, had never discussed with the law firm the scope and nature of its prior representation of Trent, and had never talked to Trent.

### 6. Court's Order

In a written order, the court denied Freund's 3.850 motion. The court stated, in pertinent part:

> From a consideration of the evidence presented the Court finds that no conflict existed at any time. Mr. Foley . . . is accused by [Freund] of having represented [Trent] at the same time. The Court finds that allegation to be unfounded and that at no time did Mr. Foley represent . . . Trent

during the time that he represented [Freund]. Additionally, Mr. Foley's prior representation of . . . Trent was in matters unrelated to this case.

Florida's Fourth District Court of Appeal affirmed the circuit court's judgment without opinion, and the Supreme Court of Florida declined to exercise its appellate jurisdiction.

### B. Federal District Court

On April 16, 1993, Freund filed the instant petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Southern District of Florida.[28] Consistent with his 3.850 motion, Freund alleged that the law firm's conflicts of interest denied Freund the effective assistance of trial counsel. For the first time, however, Freund alleged facts about Trent's aggravated assault and diazepam possession charges.

A magistrate judge reviewed the record and issued a report and recommendation. He stated, in pertinent part, that: (1) "the record supports the [state] court's finding that the law firm's representation of Trent ended prior to [its] representation of [Freund]"; (2) Freund "presented no evidence establishing that the law firm ever simultaneously represented both [Freund] and . . . Mills"; (3) Freund "failed to show 'inconsistent interests' by failing to demonstrate that the firm's prior representation of Trent or [Mills] was substantially related to the firm's representation of [Freund] or that the firm learned of relevant confidential information from these alleged prior representations"; and (4) the law firm's adoption of the insanity defense did not evince an actual conflict of interest stemming from Trent's allegations against the law firm at the severance hearing because an alternative defensive theory that "Trent . . . inflicted the fatal wounds" was "not realistic in view of the uncontradicted testimony of the eyewitnesses."[29] On November 1, 1993, the dis-

---

28. Because Freund filed his petition prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, the recent amendments to Chapter 153 of United States Code's Title 28 do not apply to this case. *See Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997).

29. The magistrate judge also rejected Freund's claim that the law firm's prior representation of Daniell concerning a pre–1988 traffic violation created another actual conflict of interest. Freund abandons this argument on appeal.

trict court overruled Freund's objections, adopted the report and recommendation and denied Freund's petition.

## III. ISSUE

The encompassing issue that we discuss is whether the district court erred in concluding that Freund was not denied effective assistance of counsel because of the law firm's conflicts of interests arising from: (1) its prior representation of Trent; (2) its prior representation of Mills; and (3) Trent's severance hearing testimony that two partners of the law firm, Colton and Foley, engaged in embarrassing and illegal conduct.

## IV. DISCUSSION

The Sixth Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment's Due Process Clause, guarantees that persons accused of state crimes "shall enjoy the right ... to have the Assistance of Counsel for [their] defense." U.S. Const. amend. VI; *Gideon v. Wainwright,* 372 U.S. 335, 342–43, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). This right, of course, includes the one presently at issue, the effective assistance of trial counsel. Under the familiar test set forth in *Strickland v. Washington,* to establish that trial counsel ineffectively assisted the defense, a habeas corpus petitioner proceeding under 28 U.S.C. § 2254 must show that (1) the lawyer's representation fell below an objective standard of reasonableness that (2) prejudiced the defense, that is, provided a reasonable probability that but for such deficient performance, the verdict would have been different. 466

U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### A. Rules of Law

The crux of Freund's ineffective assistance claim is that his trial lawyers, the law firm of Foley, Colton and Duncan, P.A., labored under conflicts of interest. The first issue that brought this case *en banc* concerns the rules of law that apply in conflict cases involving successive, as opposed to simultaneous, representations.[30] In *Cuyler v. Sullivan,* a case involving simultaneous representations, the Supreme Court held that "[i]n order to demonstrate a violation of his Sixth Amendment rights, [the petitioner] must establish that [1] an actual conflict of interest [2] adversely affected his lawyer's performance." 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Although both Freund and the State agree that the "actual conflict" prong of the *Cuyler* test applies in a successive representation case, they dispute what means are available to a petitioner to prove it. Freund contends that under this court's decision in *Smith v. White,* a petitioner may establish an actual conflict of interest through one of three means: (1) pointing to facts and circumstances that show that the lawyer's representation of the former client related substantially to the lawyer's representation of petitioner ("substantial relatedness"); (2) advancing evidence that the former client actually revealed confidential information to the lawyer during that prior representation ("confidential information"); or (3) relying on "other proof of inconsistent interests." 815 F.2d 1401, 1406 (11th Cir.1987), *cert. denied,*

---

**30.** In his 3:850 motion and 2254 petition, Freund contended that the law firm simultaneously represented both Freund and Trent. Both the state court and district court, however, found that—as a matter of historical fact—the law firm's representation of Trent terminated no later than May 2, 1984, when Trent substituted Roth for the law firm to represent him in the aggravated assault and diazepam possession prosecutions. Additionally, the record is not in dispute that Freund became the law firm's client soon after the stabbing in late July 1984. Moreover, implicit in its order, the state court found credible Colton's live testimony at the 3.850 hearing that although Trent called him after the murder, they did not discuss the facts surrounding it. *See generally Cave v. Singletary,* 971 F.2d 1513, 1516 (11th

Cir.1992) ("[S]tate court findings of fact can be inferred from its opinion and the record."). On appeal, Freund advances no serious challenge to these express and implied findings. Thus, we presume correct the finding that the law firm's representation of Trent terminated prior to the commencement of the law firm's representation of Freund. *See* 28 U.S.C. § 2254(d) (1996) (state court findings of historical fact made after evidentiary hearing are presumed correct); *Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) ("Title 28 USC § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *accord Freund,* 117 F.3d at 1570 n. 61.

484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). The State, also citing *Smith,* asserts that only the first two means are available to the petitioner and that they must be employed in the conjunctive (that is, petitioner must prove both substantial relatedness and confidential information). The State argues that courts should forgo a showing of confidential information only in pretrial disqualification proceedings where preventing use of privileged discussions remains essential.

■■■ We hold and reaffirm that *Smith* articulates this circuit's test for proving an "actual conflict" in the successive representation context. 815 F.2d at 1405–06. We, however, disagree somewhat with each party's interpretation of *Smith.* Rather, we interpret *Smith* to mean the following. An "actual conflict" of interest occurs when a lawyer has "inconsistent interests." *Smith,* 815 F.2d at 1405. In order to prove that an "actual conflict" hindered petitioner's lawyer's performance, petitioner "must make a factual showing of inconsistent interests" or point to "specific instances in the record" to suggest an actual impairment of his or her interests. *Smith,* 815 F.2d at 1404; *Oliver v. Wainwright,* 782 F.2d 1521, 1524–25 (11th Cir.) (emphasis and internal quotation marks omitted), *cert. denied,* 479 U.S. 914, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986). "[G]enerally, it is more difficult to prove that successive representation caused an actual conflict of interest than that simultaneous representation did so." *Smith,* 815 F.2d at 1405. At minimum, petitioner must "show that *either* (1) counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of [petitioner], *or* (2) counsel actually learned particular confidential information during the prior representation of the witness that was relevant to [petitioner's] later case." *Smith,* 815 F.2d at 1405 (emphasis added).[31] Even proof of *both* substantial relatedness and confidential information, however, may not necessarily be enough to demonstrate "inconsis-

tent interests" in a successive representation case. *See Smith,* 815 F.2d at 1406. The situation may call for "other proof of inconsistent interests." 815 F.2d at 1406. Overall, the "actual conflict" inquiry is fact-specific, consistent with the petitioner's ultimate burden "to prove that his conviction was unconstitutional." *Smith,* 815 F.2d at 1406.

■■ . Contrary to the State's position, we find no compelling reason to break with *stare decisis* in requiring as a necessary condition to proving an "actual conflict" the actual revelation of confidential information during the prior representation. The rule of law in this circuit is (and will continue to be) that "once the former client [petitioner] proves that the subject matters of the present and prior representations are 'substantially related,' the court will irrebutably presume that relevant confidential information was disclosed during the former period of representation." *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 646 F.2d 1020, 1028 (5th Cir.1981), *cert. denied,* 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981). It is true that this rule has its origin in pretrial proceedings concerning motions to disqualify lawyers, as opposed to post-conviction proceedings concerning Sixth Amendment violations. *E.g., Duncan,* 646 F.2d at 1033 (vacating district court's order granting defendant's motion to disqualify plaintiff's lawyer. for want of sufficient evidence that lawyer's current representation of plaintiff substantially related to the lawyer's former representation of defendant). Yet, the rationale behind the rule applies to both types of proceedings. The reason for this presumption is that it is not practical or fair to require a subsequent client (*e.g.,* Freund) to prove what specific facts the former client (*e.g.,* Trent and Mills) disclosed to the lawyer during the prior representation. Moreover, standards of professionalism often prevent the lawyer from disclosing such information without the former client's consent.[32] To avoid these complications, upon a

---

**31.** Although *Smith* speaks of a "witness," we find no reason not to extend its rule of law to non-testifying, separately-tried codefendants (*e.g.,* Trent).

**32.** Of course, former clients may waive rights to continuing confidentiality if they testify about the confidences (*e.g.,* Trent's severance hearing testimony, and Mills's deposition testimony that Roth conducted in Duncan's presence). *See generally Kraft, Inc. v. Alton Box Board Co. (In re Corrugat-*

showing of substantial relatedness, we presume that the former client (*e.g.,* Trent and Mills) divulged to the lawyer (*e.g.,* Colton) all of his or her confidences relevant to the subject of the representation. The State fails to reconcile its position with these practical difficulties of proof that are equally present in the post-conviction context. *See* Appellee's *En Banc* Answer Brief at 8 ("[T]he presumption serves no useful purpose in the context of the instant case since representation of the new client, i.e. Freund had already occurred when the allegation of conflict arose.").

■ Nor do we accept the State's view that *Cuyler*'s "adverse effect" prong should not apply in a successive representation case. It points to the Fifth Circuit's decision in *Beets v. Scott,* 65 F.3d 1258 (5th Cir.1995), *cert. denied,* 517 U.S. 1157, 116 S.Ct. 1547, 134 L.Ed.2d 650 (1996), and asserts that a *Strickland* "prejudice" analysis (that is, a reasonable probability that the verdict would have been different but for the conflict) is more appropriate than *Cuyler*'s more lax "adverse effect" test (that is, counsel refrained from pursuing a reasonable, alternative defense strategy because of an actual conflict). We, however, decline to consider the State's argument. First, the State did not raise the argument before the district court and the panel, nor did it serve as a basis for the State's suggestion for rehearing *en banc.* Second, our cases have required a showing of adverse effect in the successive representation context. *E.g., Lightbourne v. Dugger,* 829 F.2d 1012, 1024 (11th Cir.1987) (finding "no adverse effect upon petitioner's representation" even though petitioner's lawyer, an assistant public defender, had to cross-examine "a client formerly represented by the same public defender's office"), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). Finally, a resolution of this contention is not essential to this case because even under the more lax *Cuyler* standard, we find no adverse effect in this case, as we explain in section IV, part C, subsection 2 of the opinion.

*ed Container Antitrust Litigation),* 659 F.2d 1341, 1347 (5th Cir.1981) ("The presumption avoids

■ Accordingly, with regard to "adverse effect," the rule of law in this circuit is (and continues to be) the same rule that the panel employed:

> To prove adverse effect, a habeas petitioner must satisfy three elements. First, he must point to "some plausible alternative defense strategy or tactic [that] might have been pursued." *United States v. Fahey,* 769 F.2d 829, 836 (1st Cir.1985); *see also Porter [v. Wainwright,* 805 F.2d 930, 939–40 (11th Cir.1986), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 682 (1987) ]. Second, he must demonstrate that the alternative strategy or tactic was reasonable under the facts. Because prejudice is presumed, *see Strickland,* 466 U.S. at 692, 104 S.Ct. 2052, the petitioner "need not show that the defense would necessarily have been successful if [the alternative strategy or tactic] had been used," rather he only need prove that the alternative "possessed sufficient substance to be a viable alternative." *Fahey,* 769 F.2d at 836. Finally, he must show some link between the actual conflict and the decision to forgo the alternative strategy of defense. In other words, "he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." [*Fahey,* 769 F.2d at 836].

*Freund,* 117 F.3d at 1579–80. It bears repeating, however, that "[p]rejudice is presumed only if the defendant demonstrates that … 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052 (quoting *Cuyler,* 446 U.S. at 358, 100 S.Ct. 1708).

### B. Standard of Review

The second principal issue that brought this case *en banc* concerns the standard of review. Specifically, we directed the parties to brief the following question:

> Is a lower court's determination that a law firm's prior representation in a matter is or is not "substantially and particularly related," *see Smith v. White,* [815 F.2d at

compelling the former client to prove the very things that he seeks to keep confidential.").

1405], to a later representation for purposes of evaluating an ineffective-assistance-of-counsel claim based on a conflict of interest: (a) a question of fact; (b) a question of law; (c) a mixed question of law and fact?

In this case, both lower courts have presented us with relatedness determinations. The state court said that the law firm's "prior representation of Mr. Trent was in matters unrelated to" its representation of Freund. Likewise, the district court decided that the law firm's representation of Freund not only was not "substantially and particularly related" to the law firm's prior representation of Trent on his aggravated assault and diazepam possession charges, but also beared no "correlation between the firm's alleged representation of ... Mills on a prior cocaine charge[.]"

■ Our resolution of this issue will dictate whether we defer to these determinations or analyze their underlying arguments anew. Unquestionably, state court findings of fact are subject to the presumption of correctness, and similar federal district court findings are deemed correct unless clearly erroneous. *Collier v. Turpin,* 155 F.3d 1277, 1289–90 (11th Cir.1998). Questions of law and mixed questions of law and fact, on the other hand, mandate *de novo* review. *Buenoano v. Singletary,* 74 F.3d 1078, 1083 (11th Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 520, 136 L.Ed.2d 408 (1996). Not surprising, then, Freund contends that relatedness is a pure question of law. The State, in contrast, asserts that relatedness is a pure question of fact.

■ Upon close scrutiny, we hold that the issue of whether a lawyer's prior representation is substantially and particularly related to a subsequent representation is a mixed question of law and fact. To be sure, the relatedness inquiry involves both legal and factual components. Reference to a law book alone cannot resolve the issue. Historical facts—such as the nature and scope of each representation and what the lawyer did for each client—are necessary predicates to linking the two representations. *See Thomas v. Zant,* 697 F.2d 977, 980 (11th Cir.1983) ("[S]pecific historical facts found by a state

habeas court (*such as what an attorney actually did for his client*), to which a standard of law is applied in deciding a mixed question of fact and law, ... merit section 2254(d)'s presumption of correctness in a federal habeas proceeding[.]") (internal quotation marks and citation omitted; emphasis added). Indeed, we have repeatedly instructed that petitioners "must make a *factual* showing of inconsistent interests" to prove the existence of an actual conflict. *United States v. Mers,* 701 F.2d 1321, 1328 (11th Cir.) (emphasis added), *cert. denied,* 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983); *see also Burden v. Zant,* 24 F.3d 1298, 1305 (11th Cir.1994); *Porter v. Singletary,* 14 F.3d 554, 560–61 (11th Cir.), *cert. denied,* 513 U.S. 1009, 115 S.Ct. 532, 130 L.Ed.2d 435 (1994); *Smith,* 815 F.2d at 1404; *United States v. Romero,* 780 F.2d 981, 986 (11th Cir.1986); *Barham v. United States,* 724 F.2d 1529, 1532 (11th Cir.), *cert. denied,* 467 U.S. 1230, 104 S.Ct. 2687, 81 L.Ed.2d 882 (1984); and *United States v. Carter,* 721 F.2d 1514, 1536 (11th Cir.), *cert. denied,* 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984).

Our holding also fits squarely within the Supreme Court's growing list of issues that involve mixed questions of law and fact, that is, applications of law to historical fact. In *Sumner v. Mata,* the Court held that "the ultimate question as to the constitutionality of the pretrial identification procedures used in [a] case is a mixed question of law and fact[,]" but "the questions of fact that underlie this ultimate conclusion are governed by the statutory presumption[.]" 455 U.S. 591, 597, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). Similarly, in *Miller v. Fenton,* the Court stated that the "ultimate constitutional question" of the admissibility of a confession is a "mixed question of fact and law" subject to plenary federal review. 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). And, more recently, in *Thompson v. Keohane,* the Court found that "the ultimate 'in custody' determination for *Miranda* purposes" also involved mixed questions of law and fact. 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

In *Thompson,* the Court acknowledged that "[i]n regard to § 2254(d), as in other

contexts, the proper characterization of a question as one of fact or law is sometimes slippery." 516 U.S. at 110–11, 116 S.Ct. 457 (footnote omitted). Essentially, though, the Court summarized its precedents as limiting the presumption of correctness to "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators." *Thompson*, 516 U.S. at 110, 116 S.Ct. 457 (internal quotation marks and citations omitted). The Court also pointed to limited instances where questions of fact can go beyond the purely historical ones touching upon "what happened," labeling them questions that "depend[ ] heavily on the trial court's appraisal of witness credibility and demeanor." *Thompson*, 516 U.S. at 111, 116 S.Ct. 457 (citing the issues of competency to stand trial and juror impartiality as examples of questions of fact that depend upon the state court's credibility assessment); *accord Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir.1998) ("The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct.").

Plainly, linking the subject matters of prior and subsequent representations does not lend itself to a "basic, primary or historical" factual review. The State neither advances, nor do we find, anything special about the relationship between a prior and subsequent representation that would necessitate deference to the state court's credibility assessment. To the contrary, once the petitioner paints the factual picture of the two representations and what the lawyer did in each, a relatively dry and common sense evaluation ensues to determine whether they are sufficiently linked. Perhaps that is why our cases suggest that all the elements of an ineffective assistance of counsel claim premised on conflicts of interest involve mixed questions of law and fact. *E.g., Porter*, 14 F.3d at 561 ("Questions involving conflicts of interest are mixed determinations of law and fact subject to *de novo* review."); *Oliver*, 782 F.2d at 1524 ("[Q]uestions involving conflicts of interest[,]" including the "ultimate issue" of whether the facts "support the conclusion that an actual conflict of interest existed[,]"

are "mixed determinations of law and fact not entitled to a presumption of correctness under 28 U.S.C. § 2254(d) (1982)."). In short, we find every reason to treat equally the ultimate conclusion of substantial relatedness, one of the potentially dispositive elements of a conflict claim stemming from successive representations. The historical facts underlying that conclusion, however, continue to be subject to the presumption of correctness. To hold otherwise would violate well-established notions of comity and federalism. *See generally Mason v. Balcom*, 531 F.2d 717, 721 (5th Cir.1976) ("[C]onsiderations of comity do not obligate federal courts in habeas corpus cases to defer to state determinations on matters of federal law. The obligation of the federal judge is the opposite: to apply the proper federal constitutional standards based on the underlying facts[.]") (citation omitted).

### C. Merits

Finally, we turn to the merits of Freund's claim—the third issue that brought this case *en banc*. Under *de novo* review, we examine in turn the three alleged sources of the law firm's conflicts of interest.

#### 1. Actual Conflict

##### i. Prior Representation of Trent

Freund's main ·contention is that the law firm's prior representation of Trent on aggravated assault and diazepam possession charges presented inconsistent interests with its representation of Freund concerning the stabbing death of Walker. Specifically, Freund claims that contrary to the district court's judgment, he established that these representations were substantially related. We, however, are not convinced.

First, Freund failed to establish a record at the 3.850 hearing concerning the scope and nature of the law firm's prior representation of Trent. *See generally Duncan*, 646 F.2d at 1031 (stating that "although Merrill Lynch ha[d] repeatedly asserted that the present and former representations [were] substantially related, it ha[d] demonstrated no more than a *surface and superficial connection* between the mat-

ters") (emphasis added). Freund's lawyer *never questioned Colton*—the law firm attorney who initially represented Trent regarding the drug possession and aggravated assault charges—at the 3.850 hearing. Freund's lawyer thus failed to elicit *any* information from the person most likely to know the scope and nature of the prior representation.[33] The State, however, did question Colton about his prior representation of Trent. He unequivocally testified that his representation of Trent was not in any way connected to the facts of the murder. *Cf. Barham v. United States*, 724 F.2d 1529, 1532 (11th Cir.) (affirming the district court's conclusion that no actual conflict existed, noting that the lawyer testified "that his representation of [former client] 'had not the remotest connection' with [defendant's] trial"), *cert. denied*, 467 U.S. 1230, 104 S.Ct. 2687, 81 L.Ed.2d 882 (1984). Although Freund's counsel questioned Duncan, Colton's partner, he neglected to ask Duncan *any* questions about the scope of the law firm's prior representation of Trent on matters other than Duncan's involvement with the civil forfeiture proceeding that Freund does not claim to be substantially related to the murder.

■ The only substantive testimony that Freund presented regarding the scope and nature of the law firm's prior representation of Trent consisted of the testimony of Dick and Freund's rebuttal expert witness. Dick, a part-time private investigator, testified that he never completed the *only* work that Trent (and possibly Colton) requested, that is, investigate the background of Vana, the alleged victim of Trent's aggravated assault charge. Dick also testified that neither Colton nor Trent requested that he do any investigative work with respect to Trent's drug possession charge. With regard to Freund's expert witness in the area of criminal law, the State elicited during its cross-examination that he was not a board certified criminal lawyer, that he had never talked to anyone from the law firm about the scope and nature of their prior representation of Trent, and that he had never talked to Trent. The district court did not err in concluding that Freund "failed to ... demonstrate that the firm's prior representation of Trent ... . was substantially related to the firm's representation of [Freund]."[34]

Even if we consider the allegations contained in Freund's petition to the district court—allegations that Freund clearly did not attempt to prove at the 3.850 hearing—they do not support the conclusion that Freund's counsel labored under an actual

---

33. Of course, any conflict of interest attributable to Colton imputes equally to "his current partners and employees." *Cox v. American Cast Iron Pipe Co.*, 847 F.2d 725, 729 (11th Cir.1988); *see also* Rule Regulating Fla. Bar 4–1.10(a) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any 1 of them practicing alone would be prohibited from doing so[.]").

34. Permitting "expert" testimony to establish ineffective assistance is inconsistent with our recognition that the issue involved is a mixed question of law and fact that the court decides. We recently explained as much in *Provenzano v. Singletary*, a capital case in which the petitioner had offered the affidavit of an experienced criminal defense attorney (the Public Defender of Orange County, Florida) in an attempt to establish that the failure of trial counsel to seek a change of venue amounted to ineffective assistance of counsel. 148 F.3d 1327, 1331–32 (11th Cir.1998). In discussing why that affidavit was not enough to entitle the petitioner to an evidentiary hearing on ineffective assistance, we stated:

There is another more fundamental reason why Provenzano is not entitled to an evidentia-

ry hearing on the reasonableness of his counsel's decision to forego a change of venue, regardless of any affidavit he may have proffered. Our *Jackson, Horton,* and *Bundy* decisions establish that the reasonableness of a strategic choice is a question of law to be decided by the court, not a matter subject to factual inquiry and evidentiary proof. Accordingly, it would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable. The question is not one to be decided by plebiscite, by affidavits, by deposition, or by live testimony. It is a question of law to be decided by state courts, by the district court, and by this Court, each in its own turn.

*Provenzano*, 148 F.3d at 1332. Likewise, in the present case, whether a law firm rendered ineffective assistance of counsel because of a conflict of interest, under a given set of facts, is "a question to be decided by the state courts, by the district court, and by this Court, each in its own turn." *Provenzano*, 148 F.3d at 1332. Thus, it is not a matter subject to expert testimony.

conflict. In 1983, Trent allegedly brandished a gun on a public street and threatened to kill two persons. The alleged facts were that Trent was speeding recklessly through a residential area and screeched to a halt. Vana came out of her apartment fearing that Trent had struck a neighborhood child. She asked Trent why he was driving like that. Trent told her to mind her own business or she would get hurt. When Vana's husband approached, Trent pulled out a handgun from a holster in his waistband and asked her if she "wanted this one or the other," motioning to a gun that he supposedly had in his back waistband area. A few days later, when the officers arrested Trent, they discovered diazepam in Trent's car.

It is clear from the foregoing description of Trent's arrest that the aggravated assault charge did not involve Freund, Walker or any of the other individuals who figured prominently in the Walker murder investigation, and Freund does not allege that he knew the Vanas or the other witnesses involved in the aggravated assault complaint. Similarly, the diazepam possession charge, and ensuing forfeiture proceeding, did not actually involve anyone connected to the Walker murder case, except Trent. Therefore, any determination of a "substantial relationship" between the law firm's prior representation of Trent and subsequent representation of Freund can only be based on the nature of the offenses involved in the representations, that is, the fact that diazepam and guns were involved in both representations.

Such vague similarities, however, do not establish a substantial relationship between a prior and subsequent representation—especially where, as here, myriad factors differentiate the subject matter of each representation. *Kraft*, 659 F.2d at 1346 (substantial relatedness exists when "the present action and the past representation concern the *very same* subject matter") (emphasis added); *United States v. Martinez*, 630 F.2d 361, 362 (5th Cir.1980) (substantial relatedness existed because prior representation concerned "same [criminal] transactions" and "same events" at issue in defendant's case), *cert. denied*, 450 U.S. 922, 101 S.Ct. 1373, 67

L.Ed.2d 351 (1981). The aggravated assault occurred in a completely different setting— on a city street rather than in Trent's apartment. Although Trent shot at Walker before he died, the bullet neither hit Walker nor caused his death. Undisputably, the cause of Walker's death was stabbing. Furthermore, no evidence exists in the record that the gun was the same one that Trent used in the aggravated assault case. *See* Appellants' *En Banc* Reply Letter at 26 (conceding "the lack of hard evidence that both cases involved the same gun"). It was equally uncontested that Trent owned several guns and waved them around as a symbol of his authority.

The connection between Trent's diazepam possession charge and the stabbing was equally as tenuous. Although the coroner found a derivative of diazepam in Walker's body, the drug did not kill Walker. Again, Walker died from stab wounds. Moreover, it was undisputed that Trent was the source of the diazepam that was injected into Walker's body on the night of the murder. No one alleged that Freund was the one who brought it to Trent's apartment. Likewise, the fact witnesses testified that Freund, Trent and Daniell all took turns injecting Walker with the diazepam and vodka mixture. Therefore, regardless of Freund's failure to meet his burden of proof, the district court did not err in concluding that "Trent's prior charges of possession of diazepam and aggravated assault [were] not 'substantially and particularly' related to [Freund]'s murder trial."

█ Finally, the district court correctly found that Freund failed to demonstrate that the law firm "learned of relevant confidential information from" Trent. As we explained in section IV, part A, of this opinion, we cannot presume confidential information · unless Freund proved substantial relatedness, which he did not. Nor did Freund elicit any independent proof of confidential information. The only arguably relevant information that the law firm knew about Trent, his arrest for and charges of possession of diazepam and aggravated assault, were matters of public record. Under the Rules Regulating the Florida Bar, the law firm's knowledge of

those charges cannot be the basis of a conflict of interest:

> A lawyer who has formerly represented a client in a matter shall not thereafter ... use information relating to the representation to the disadvantage of the former client except as rule 4–1.6 [confidentiality] would permit with respect to a client or when the information has become generally known.

Rule Regulating Fla. Bar 4–1.9(b). In addition, the comment to rule 4–1.9 provides that:

> Information acquired by the lawyer in the course of representing a client may not subsequently be used by the lawyer to the disadvantage of the client. *However, the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client.*

Rule Regulating Fla. Bar 4–1.9 cmt. (emphasis added). Just as "generally known" was any disparaging information about Trent that Trent himself. chose to divulge at the severance hearing.

At best, the law firm faced a potential conflict of interest before the court severed Trent's and Freund's trials. *See United States v. McCutcheon*, 86 F.3d 187, 188–89 (11th Cir.1996) (affirming the district court's disqualification of defendant's lawyer because his prior representation of the codefendant who had "confided to [the lawyer] certain personal information concerning his background" ethically prevented cross-examination in joint trial). Consistent with the Bar Opinion, however, the court's severance order and the prosecutor's decision not to call Trent to testify removed the possibility that the law firm would cross-examine its former client. Thus, at no time did the law firm's hypothetical conflict of interest rise to the level of an actual conflict of interest. *See Cuyler*, 446 U.S. at 350, 100 S.Ct. 1708 ("[T]he possibility of conflict is insufficient to impugn a criminal conviction.").

### ii. Prior Representation of Mills

 Freund also contends that the law firm labored under an actual conflict of interest arising from Colton's prior consultation with Mills about the facts of a cocaine charge.[35] Again, Freund's efforts at the 3.850 hearing to develop the historical facts surrounding Colton's consultation with Mills were lacking. He never questioned Colton, the witness who could provide the most relevant information (since he did not subpoena Mills to testify). The State elicited any and all testimony about the law firm's prior representation of Mills.

In any event, from Freund's trial, we know that in early 1984, an undercover police officer arrested Mills after she attempted to sell him a kilogram of cocaine. Duncan himself elicited this information on cross-examination of Mills. *See supra* note 24. In addition, the 3.850 hearing provided Colton's admission that he had "consulted" with Mills about the cocaine trafficking charge. They also discussed the possibility that she would provide substantial assistance to the Palm Beach County Sheriff's Office. He insisted that the meeting with Mills was brief and that after he quoted her a fee, he never saw her again in an official capacity.

It is true that "[a]n attorney who cross-examines a former client inherently encounters divided loyalty." *Lightbourne*, 829 F.2d at 1023. "[I]n a successive representation case," however, "mere proof that a criminal defendant's counsel previously represented a witness is insufficient to establish 'inconsistent interests.'" *Smith*, 815 F.2d at 1405. Rather, the petitioner must prove inconsistent interest under the framework that we reaffirmed in section IV, part A, of this opinion. Thus, to show an actual conflict stemming from the law firm's prior representation of Mills, Freund—at the very least—needed to prove either substantial relatedness or the actual revelation of confidential information.

Freund established neither. As with Trent, nothing more than vague similarities linked the representations of Mills and

---

**35.** We assume, without deciding, that this brief consultation constituted a "representation" for purposes of a conflict of interest.

Freund. Even if Mills had admitted to Colton that she trafficked a kilogram of cocaine to an undercover officer, that information had no bearing on Freund's case. Mills admitted on the stand that she had used cocaine in the past and on the night of the murder, and Trent's referring her to the law firm is inconsequential. It is undisputed that Colton did not do any work for Mills other than "consult" her. Thus, any additional bias on Mills's part toward Trent that Freund claims his lawyers were aware of was, at best, nominally probative.

Regarding confidential information, Mills waived her rights when she testified to everything that she had told Colton in a deposition at Roth's direction and in Duncan's presence. Therefore, even if Mills had divulged relevant confidential information to Colton—a showing that Freund made little to no effort to advance—the confidential nature of it ceased to exist when she disclosed it to a third party prior to trial. At the time that Duncan cross-examined Mills, his law firm's prior representation of her presented no more than a hypothetical conflict of interest. Accordingly, the district court did not err in concluding that Freund "failed to establish any correlation between the firm's alleged representation of . . . Mills on a prior cocaine charge . . . and [its] representation of [Freund]."

### iii. Trent's Allegations

 Lastly, Freund points to Trent's allegations at the pretrial severance hearing of embarrassing and illegal conduct against members of the law firm as a source of an actual conflict of interest. In Freund's view, it was in the law firm's own best interest not to antagonize Trent for fear that he would repeat the allegations again. Freund's argument, however, cannot stand. Concerning Trent's allegations of illicit activities on the part of the lawyers, even Freund concedes that the damage was done. *See* Appellants' Initial Brief at 39 ("[O]nce Trent testified at the pretrial [severance] hearing, the damage was done[.]"). Trent made the allegations of the lawyers' condoning drug use and participating in prostitution parties with him in open court, at a hearing that received a significant amount of media attention. And, in front of the media, Colton was able to deny "*each and every* accusation . . . *unequivocably and totally.*" [36] Accordingly, Trent's allegations—that Colton denied under oath and Freund did not reiterate at the 3.850 evidentiary hearing—did not cause an actual conflict between the law firm's and Freund's interests.

### 2. Adverse Effect

Even if any of the alleged conflicts of interest rose to the level of an actual conflict, we fail to find any adverse effect flowing from them.[37]

### i. Failure to Shift the Blame to Trent

 Freund contends that but for the law firm's allegiance to Trent because of its prior and extensive representation of him and Trent's public allegations of embarrassing and illicit conduct on the part of Colton and Foley, it would have pursued a blame-shifting defense that Trent, as opposed to Freund, actually stabbed Walker to death. Freund points to Foley's closing argument where he "wondered whether Trent did it" as evidence that even the law firm realized the superiority of this defense over insanity. The State responds that in light of the undisputed testimony of all three fact witnesses that Freund stabbed Walker to death, the law firm pursued the only viable theory of the case available to it. It further points out that Freund's unique insanity defense, that is, that Trent knowingly took advantage of Freund's organic brain damage and manipu-

---

36. Additionally, the truth of Trent's allegations was irrelevant to the fact-finding necessary to the charge of murder. Where, as here, the lawyer is not a fact witness, the lawyer's out-of-court conduct is never pertinent to the crime with which the client is charged. *See generally* Fla. Stat. §§ 90.401, 90.402 (1997).

37. Although we have already found that no actual conflict existed, we feel compelled to address the adverse effect prong because our cases have sometimes discussed, in the context of actual conflict, issues (namely, blame-shifting) that are more appropriately analyzed in the context of adverse effect. *See, e.g., Romero,* 780 F.2d at 986.

lated him like a robot, shifted the blame to Trent somewhat—refuting any suggestion that the alleged conflicts of interest motivated the law firm's strategy.

We agree with the State. It is true that "a strategy of shifting blame to one's codefendant[ ] is a legitimate and often effective defense strategy[.]" *Mers,* 701 F.2d at 1330. In this case, however, a wholesale shifting of the blame to Trent was not a plausible defensive "option *realistically* available to trial counsel[,]" regardless of the law firm's prior dealings with Trent. *Carter,* 721 F.2d at 1537 (internal quotation marks omitted and emphasis added); *accord Freund,* 117 F.3d at 1580 (alternative strategy must be "reasonable under the facts" and "possess[ ] sufficient substance to be a viable alternative"). Duncan testified at the 3.850 evidentiary hearing that Freund admitted to him that he stabbed Walker, confessed to committing the stabbing to Foley at their first meeting at the law firm's offices, and later told his psychiatrist that he stabbed Walker because Trent told him to do it. Freund did not elicit testimony from Duncan that either he or Foley had any factual basis to doubt Freund's confessions.[38]

Freund correctly points out that all of the State's physical evidence—that is, the apartment, bloody knife, steamer trunk that contained Walker's body, sledgehammer, handcuffs, duct tape, guns, dented baseball bat, blood-soaked towels, dining room chair with a bullet lodged in it, van with Trent's and Fullerton's fingerprints, syringes, bottles of diazepam, empty capsules of magnesium sulfate, and liquor bottles—either belonged to or was found on property of Trent. Physical evidence, however, is only as persuasive as the witnesses who authenticate and tell the story behind it. At Freund's trial, and from the start of the police's investigation, all three of the State's principal fact witnesses—Mills, Angelilli and Daniell—testified against Freund. They all testified that Freund was present at Trent's apartment the night of the murder and that, at Trent's direction, he

injected Walker first with magnesium sulfate, then with mixtures of vodka and diazepam, and finally with air. Angelilli testified that Freund make stabbing motions in the direction of Walker's body—testimony that directly implicated Freund. Corroborating Angelilli's testimony, Daniell stated that he saw Freund pick up Trent's knife and approach Walker. And, all three witnesses testified that Freund was alone in the main room with Walker for a short time, and that afterward he came into the bedroom with blood on his shirt and said, "It's over."

Attempting to get Mills, Angelilli and Daniell to change their implication of Freund on cross-examination would have proved fruitless. Duncan had observed the witnesses' testimonies during Trent's trial, and tactically determined that their stories would survive rigorous cross-examination. In Duncan's professional view, these witnesses would simply "not back off of their testimony." To be sure, Freund points to no evidence that Trent—if the law firm had called him to testify—would have exculpated him, even though he had pleaded guilty to second-degree murder before Freund's trial commenced. *See Carter,* 721 F.2d at 1537 (Defendant "points to no evidence that a codefendant could have exculpated him."). That Trent may have been more motivated than Freund to kill Walker is inconsequential. *See Oliver,* 782 F.2d at 1525 (blame shifting was not realistic because although codefendant had a motive to kill the victim, no witness saw him holding the knife or could corroborate his opportunity to do so). Simply put, no fact witness—including Freund himself—could corroborate Freund's innocence.

Additionally, we observe that in light of Freund's confessions to Foley, Duncan and his psychiatrist, the law firm's lawyers could have been disbarred if they had pursued a complete blame-shifting defense. Although it would certainly be ethical to argue reasonable doubt—and put the State to its burden of proof—it would not be ethical to affirma-

---

38. We note that Freund did not point to Stob's trial testimony that during his visit to the jail Freund denied killing Walker as evidence that the law firm should have doubted his confession. Indeed, the State called Stob to testify in its rebuttal case (probably to show consciousness of guilt), indicating just the opposite, that is, that the law firm tactically determined that Stob lacked credibility.

tively point the finger at someone else. *See* R. Regulating Fla. Bar 4-3.3(a)(1), (4); (c) ("A lawyer shall not knowingly: (1) Make a false statement of *material fact* ... to a tribunal; ... (4) *Offer evidence* that the lawyer knows to be false[;] .... (c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is *false*.") (quoted in *The Florida Bar Re Rules Regulating the Florida Bar*, 494 So.2d 977, 1057–58 (Fla.1986)). "Of course, the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *United States v. Cronic*, 466 U.S. 648, 656 n. 19, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *see also Nix v. Whiteside*, 475 U.S. 157, 168, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ("[A]n attorney's ethical duty to advance the interest of the client is limited by an equally solemn duty to comply with the law and standards of professional conduct.").

Freund failed to establish not only the first and second elements of adverse effect, but also the third prong, that is, "some link between the actual conflict and the decision to forgo" a blame-shifting defense. *Freund*, 117 F.3d at 1580. First, the record does not support Freund's contention that the law firm's allegiance to Trent under the rules of professional conduct necessarily colored every decision that it made from the outset of its representation of Freund. As the State correctly contends, the law firm did, in fact, attempt to shift the blame to Trent to some degree. If proven in a joint trial, the law firm's theory of defense that Trent knew that Freund's organic brain damage rendered him susceptible to influence, and that he manipulated Freund like a robot to kill Walker, would certainly not have guaranteed Trent's acquittal on the first-degree murder charge. A jury could still find Trent guilty of the capital offense as an accessory before the fact if, along with helping Freund kill Walker, he intended that Freund kill Walker. *See* Fla. Stat. § 777.011 (1983). A jury could also find Trent guilty of first-degree felony murder, even if he did not commit the killing. *See Cave v. State*, 476 So.2d 180, 186 (Fla. 1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct.

2907, 90 L.Ed.2d 993 (1986). The prosecution could even get the death penalty if it proved that Trent acted either with the intent that Walker die or with reckless disregard for Walker's life. *See Enmund v. Florida*, 458 U.S. 782, 798, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (intent that victim die); *Tison v. Arizona*, 481 U.S. 137, 157–58, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (reckless disregard for victim's life). At best, Freund's implicit admission that he committed the stabbing would mitigate against the death penalty for Trent. *See* Fla. Stat. § 921.141(6)(d). That Freund's successful plea of insanity in a joint trial *could* have relieved both he and Trent of criminal liability reconciles entirely with a conclusion that the law firm provided effective assistance of trial counsel.

Similarly, the timing of Trent's allegations at the severance hearing belie Freund's contention that they motivated the law firm's decision not to point affirmatively the finger at Trent. Both Foley's press conference and formal notice of intent to rely on insanity pre-dated Trent's allegations at the severance hearing. Also, Trent's lawyer learned of Freund's statement to the psychiatrist *before* the pretrial severance hearing, providing the reason for requesting the severance and possibly giving Trent the motivation to make the allegations against Foley and Colton at the hearing. Indeed, given the undisputed testimony that Trent's allegations "angered" the law firm, they arguably provided an *incentive* for the firm to shift more of the blame to Trent. Thus, the law firm's alleged conflict with its own interests not to antagonize Trent "played absolutely no role in counsels' ... strategy." *Buenoano*, 74 F.3d at 1086.

In short, we conclude that conflict-free counsel would have chosen the same defense that the law firm that Freund retained did. Because Freund confessed to the killing, and the firm had strong and reasonable medical proof of his organic brain damage, insanity was the law firm's only viable and plausible defense, as Duncan testified at the 3.850 hearing. We also credit Duncan's testimony that he did not refrain from doing anything for Freund as a result of the law firm's prior

representation of Trent. *Cf. Porter,* 14 F.3d at 561 (finding no error in the district court's finding of no conflict of interest that was based, in part, on the district court's crediting the lawyer's testimony that he did not refrain from asking his former client any questions on cross-examination because of his prior representation of that client). Accordingly, the district court did not err in concluding that "the alternative theory proposed by [Freund] [was] not realistic in view of the uncontradicted testimony of the eyewitnesses."

### ii. Failure to Further Cross–Examine Mills

■■■ Finally, Freund points to Duncan's cross-examination of Mills as evidence that the law firm's conflict of interest adversely affected its defense of Freund. Specifically, Freund argues that a conflict-free lawyer could have used information that Trent referred her to Colton to further impeach Mills and suggest bias in favor of Trent. We are not convinced. Under our recitation of the law of adverse effect in section IV, part A, it matters not what a conflict-free lawyer *could* have done, but what he or she *would* have done. In other words, Freund had the burden of proving through a preponderance of the evidence that Duncan would have questioned Mills about Trent's referring her to the law firm but for Colton's professional relationship with her. This he failed to do. Freund engaged in no line of question at the 3.850 hearing to prove this notion.

If anything, Freund's cross-examination of Duncan at the 3.850 hearing established just the opposite, that is, that he *did* question Mills about Trent's assisting her to reduce the cocaine trafficking charge. This cross-examination was entirely consistent with the law firm's theory of defense, as Duncan's

undisputed testimony that he elicited facts from Mills (and Angelilli and Daniell) to show Trent's ability to control others evinced. Thus, every indication exists that tactical reasons, as opposed to an alleged conflict of interest, motivated Duncan's conduct. Accordingly, Freund failed to show a sufficient "link between the [alleged] actual conflict and the decision" not to ask Mills about her referral to the law firm, and, "at best," the omission's effect on the law firm's representation of Freund was *"de minimus."* *Freund,* 117 F.3d at 1580; *Lightbourne,* 829 F.2d at 1024.

## V. CONCLUSION

For the foregoing reasons, and in summary, we hold that: (1) the rules of law as announced in *Smith v. White,* 815 F.2d at 1404–06, govern claims of ineffective assistance of trial counsel premised on conflicts of interest stemming from successive representations; (2) the issue of whether a law firm's prior representation of a witness or non-testifying, separately-tried codefendant is substantially and particularly related to its subsequent representation of the petitioner is a mixed question of law and fact that is not subject to section 2254(d)'s presumption of correctness; and (3) the law firm did not provide ineffective assistance of trial counsel to Freund because its prior representations of Trent and Mills, as well as Trent's public allegations of embarrassing and illicit activity on the part of two of its lawyers, did not give rise to actual conflicts of interest that adversely affected the law firm's performance. Accordingly, we affirm the judgment of the district court.[39]

#### AFFIRMED.

**39.** Freund raises three other issues on appeal: (1) whether Judge Mounts's failure to conduct an inquiry into the law firm's conflicts of interest violated Freund's Sixth Amendment right to effective assistance of counsel; (2) whether the law firm's failure to conduct a pretrial investigation into the guilt of Trent and the innocence of Freund violated Freund's Sixth Amendment right to effective assistance of counsel; and (3) the district court erred in failing to conduct an evidentiary hearing. We affirm the district court's judgment on these issues without discussion. *See* Eleventh Circuit Rule 36–1. But we do note that as to the third issue, Freund concedes that "the district court was not required to conduct an evidentiary hearing in the case at bar[.]" Appellant's *En Banc* Reply Letter at 14.

Also, in light of our holdings, we need not reach the fourth issue that brought this case *en banc,* whether Freund waived any conflicts of interest on the part of the law firm.

TJOFLAT, Circuit Judge, dissenting, in which ANDERSON, BIRCH and DUBINA, Circuit Judges, join:

In this habeas corpus case, a law firm undertook to represent a client in a murder prosecution in which the client's co-defendant had been a long-standing client of the firm. The firm had represented this co-defendant for over ten years in a variety of criminal and civil matters, and the firm's members had extensive interactions with him on a social level. As a result of these professional and social interactions, the firm became privy to a great deal of information that could have been quite damaging to its former client's murder defense but which the firm could not disclose because of its ethical obligation of confidentiality to that client. At the same time, however, the firm owed ethical obligations to its current client and had a Sixth Amendment obligation to provide this client with competent representation. These obligations required that all of the firm's professional decisions be in its current client's best interests and untainted by conflicts of interest. Because the interests of the firm's current and former clients were adverse, the resulting clash of the firm's obligations to each client necessarily tainted the decisions that the firm made in representing its current client.

The firm's client in the murder prosecution, who ultimately was convicted of first-degree murder, now petitions for a writ of habeas corpus on the basis of the law firm's conflict of interest. The majority would deny the writ because, sitting as a "Monday morning quarterback," it believes that this client was not prejudiced by the firm's conflicting obligations. Because this result is constitutionally inappropriate and flies in the face of our precedents addressing ineffective assistance of counsel claims based on conflict of interest, I respectfully dissent.

In part I.A., I discuss the problems with the majority's test for determining when a lawyer has an "actual conflict of interest." In part I.B., I offer some observations re-garding the proper application of the majority's test for determining when such a conflict has an "adverse effect" on the lawyer's performance. In light of the problems and potential pitfalls identified in part I, part II reconsiders the majority's determination that the facts of this case do not meet either the actual conflict or adverse effect prongs of *Cuyler v. Sullivan.* In particular, part II.B. explains that the firm of Foley, Colton & Duncan, P.A., which represented Dr. John Freund (the petitioner) at trial, initially faced two ethically-based conflicts of interest that burdened its representation of Freund. As described in part II.C., a third conflict arose after the firm began to represent Freund that exacerbated this burden. Part III then returns to our precedents interpreting *Cuyler* and determines that none of these cases forecloses a finding that Freund's lawyers, burdened as they were by these conflicts of interest, provided ineffective assistance to Freund.[1]

I.

As both the panel and the majority have recognized, a habeas petitioner who claims that he was denied his Sixth Amendment right to the effective assistance of trial counsel because his lawyer had a conflict of interest must show "that [1] an actual conflict of interest [2] adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980); *accord Freund v. Butterworth,* 117 F.3d 1543, 1571 (11th Cir.1997), *vacated,* 135 F.3d 1419 (11th Cir.1998). Our circuit's interpretation of this standard has developed primarily in two traditional contexts: a lawyer's "simultaneous representation" of clients with adverse interests, and a lawyer's "successive representation" of a client against whom a former client appears as a witness. *See, e.g., McConico v. Alabama,* 919 F.2d 1543, 1546 (11th Cir.1990) (noting that a conflict of interest may arise in either context). The fact that these two types of conflicts arise most frequently does not mean, howev-

---

1. Because the majority does not address the issue of whether any of the conflicts of interest that affected the law firm's representation of Freund were waived by Freund, I do not discuss this issue further here. *See Freund v. Butterworth,* 117 F.3d 1543, 1582–83 (11th Cir.1997), *vacated,* 135 F.3d 1419 (11th Cir.1998).

er, that these are the only two contexts in which a lawyer's conflict of interest can deprive her client of the effective assistance of counsel. *See, e.g., Zamora v. Dugger,* 834 F.2d 956, 960–61 (11th Cir.1987) (noting that "the standard developed in *Cuyler* has been applied to cases in which defendants argue that their lawyers were more interested in publicity than in obtaining an acquittal"); *United States v. McLain,* 823 F.2d 1457, 1463 (11th Cir.1987) (finding *Cuyler* requirements met where lawyer faced possible prosecution by same United States Attorney's office that was prosecuting his client); *Zuck v. Alabama,* 588 F.2d 436, 438–40 (5th Cir. 1979) (concluding that lawyers who previously had represented the prosecutor who was prosecuting their current client had actual conflict of interest); *see also Fitzpatrick v. McCormick,* 869 F.2d 1247, 1251–53 (9th Cir. 1989) (finding denial of effective assistance of counsel where lawyer failed to present evidence that would exculpate current client at expense of non-testifying former client).[2]

It is important to keep this observation in mind when we are faced with situations, such as this one, in which an asserted conflict does not precisely fit within either of these two traditional contexts. In such situations, our prior cases interpreting the two-pronged *Cuyler* standard should be evaluated with care before they are imported into the new context.

### A.

With respect to the first prong of *Cuyler,* the majority concludes that *Smith v. White,* 815 F.2d 1401 (11th Cir.1987), articulates our circuit's exclusive test for proving an actual conflict of interest in the successive representation context. In order to establish an actual conflict under this test, a habeas petitioner must make "a showing of 'inconsistent interests.'" *Smith,* 815 F.2d at 1405. As the majority sees it, *Smith* makes proof of either substantial relatedness or disclosure of confidential information a necessary prerequisite to a finding of inconsistent interests. Even if a petitioner proves both,[3] however, this may not be sufficient to establish actual conflict—"other proof of inconsistent interests" also may be required. *Ante* at 859. Implicit in its interpretation of *Smith* is the majority's view that "other proof of inconsistent interests," standing alone, can never be sufficient to establish an actual conflict of interest.

This interpretation of *Smith,* which the majority supports with piecemeal quotations from the opinion, is incorrect for two reasons. First, the *Smith* decision itself is equivocal on the question of what role "other proof of inconsistent interests" plays in supporting a finding of actual conflict of interest. On the one hand, *Smith* states:

> In [a successive representation case where a criminal defendant's counsel previously represented a witness], if defendant fails to show that either (1) counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of defendant, or (2) counsel actually learned particular confidential information during the prior representation of the witness that was relevant to defendant's later case, then defendant has not

---

2. *But see Beets v. Scott,* 65 F.3d 1258, 1266 & n. 10 (5th Cir.1995) (en banc) ("Although the federal circuit courts have unblinkingly applied *Cuyler*'s 'actual conflict' and 'adverse effect' standards to all kinds of alleged attorney ethical conflicts, a careful reading of the Supreme Court cases belies this expansiveness." (footnote omitted)). The panel opinion in *Beets,* by contrast, contained the following assessment: "Together, [*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *Wood v. Georgia,* 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981),] suggest that the *Cuyler* analysis may not be limited to conflicts of interest involving [simultaneous] or successive representation. Consequently, it is no wonder that this court and others have recognized numerous cir-

cumstances in which an attorney has breached the duty of loyalty." *Beets v. Collins,* 986 F.2d 1478, 1481 (5th Cir.1993), *modified,* 65 F.3d 1258 (5th Cir.1995).

3. Of course, a petitioner would never actually need to prove both. As the majority acknowledges, our rule is that once the petitioner "proves that the subject matters of the present and prior representations are 'substantially related,' the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation." *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 646 F.2d 1020, 1028 (5th Cir. Unit B June 1981).

come even close to showing "inconsistent interests." 815 F.2d at 1405–06. On the other hand, the *Smith* court ultimately described its holding in the following way: "We merely hold that Smith has failed to show 'inconsistent interests' in this case where he has failed to adduce proof of substantial relationship or relevant confidential information *or any other proof of inconsistent interests.*" 815 F.2d at 1406 (emphasis added).

In order to resolve this ambiguity, it is useful to review our other cases that interpret the actual conflict standard. This review reveals that, both before and after *Smith*, our cases have sanctioned additional methods—other than substantial relatedness or disclosure of confidential information—of establishing an actual conflict in the successive representation context. *See Lightbourne v. Dugger*, 829 F.2d 1012, 1023 (11th Cir.1987) (noting that, in light of state law and principles of legal ethics, a substantial question existed as to whether an attorney crossexamining a former client had an actual conflict of interest);[4] *Porter v. Wainwright*, 805 F.2d 930, 939 (11th Cir.1986) (stating that the habeas petitioner could show an actual conflict by demonstrating that his attorney "chose between possible alternative courses of action such as eliciting or failing to elicit evidence helpful to [the petitioner] but harmful to [the lawyer's previous client]");[5] *cf. Porter v. Singletary*, 14 F.3d 554, 560

(11th Cir.1994) (stating, in the context of a claim of conflict of interest arising from a prior simultaneous representation, that a petitioner must prove actual conflict by "point[ing] to specific instances in the record which suggest an impairment or compromise of his interests for the benefit of another party"). Other circuits have reached the same conclusion. *See, e.g., Fitzpatrick v. McCormick*, 869 F.2d 1247, 1252 (9th Cir. 1989) ("In successive representation, conflicts of interest may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client *or otherwise divides his loyalties.*" (internal quotation marks omitted, emphasis added)). In light of these decisions, it seems incorrect to say that our precedents prohibit a habeas petitioner from establishing an actual conflict of interest unless she can show either substantial relatedness or disclosure of confidential information.

Assuming *arguendo* that the majority is correct in according little weight to "other proof of inconsistent interests," its interpretation of *Smith* suffers from an additional problem in that it purports to apply "in the successive representation context" as a whole. *Ante* at 859. The facts of *Smith*, however, merely presented the traditional successive representation pattern wherein a lawyer's former client appeared as a witness against his current client. In addition, the

4. The *Lightbourne* court also observed, and the panel opinion in this case acknowledged, that a violation of state ethical rules by a criminal defense lawyer does not necessarily deprive her client of the effective assistance of counsel. *See Freund*, 117 F.3d at 1572 n. 66 (quoting *Lightbourne*, 829 F.2d at 1023 n. 12). Nevertheless, when the law of ethics renders a lawyer unable to reconcile the duties she owes to separate clients, ethical considerations play an important role in determining whether she had an actual conflict of interest. This role was recognized not only in *Lightbourne*, but also in *United States v. Martinez*, 630 F.2d 361, 363 & n. 2 (5th Cir. 1980), *cited in Smith*, 815 F.2d at 1406 n. 2. In *Martinez*, the first case in our circuit to perform a conflict of interest analysis in the successive representation context, the facts demonstrated both substantial relatedness and disclosure of confidential information. The test that the court applied to these facts in order to determine whether an actual conflict of interest existed, however, was more abstract. In finding that an

actual conflict did exist, the court observed that the lawyer was "torn between conflicting duties" to his prior and current clients. *See Martinez*, 630 F.2d at 363.

5. As the panel noted, this formulation of our actual conflict test tends to blend together the actual conflict and adverse effect inquiries of *Cuyler*. *See Freund*, 117 F.3d at 1571 n. 65 (citing cases prior to *Porter* that employed this test). I mention it here merely to illustrate that the majority's unduly narrow test for actual conflict is contrary to our precedent.

It is also worth noting that *Smith* itself recognized this "possible alternative courses of action" test for actual conflict. *See Smith*, 815 F.2d at 1404 (quoting *Barham v. United States*, 724 F.2d 1529, 1532 (11th Cir.1984)). Without explanation, however, the *Smith* court failed to include this test in its subsequent list of the possible methods by which a petitioner could demonstrate actual conflict. *Id.* at 1405–06.

lawyer in *Smith* apparently represented his former client only once. In this case, by contrast, one of Freund's allegations of actual conflict involves a different type of successive representation. Freund contends that the law firm of Foley, Colton & Duncan, P.A., which represented him at trial, previously represented Trent—a separately-tried co-defendant who did not appear as a witness in Freund's trial—in a broad range of civil and criminal matters from the early 1970s until 1984. While the majority may be correct that its interpretation of *Smith* should nevertheless extend to the context presented by this claim, *ante* at 859 n. 31, this does not mean that the legal interpretation our previous cases have given to the two elements of the *Smith* test—substantial relatedness and disclosure of confidential information—should mechanically be applied in this new factual context. I address this point more fully in part II.A., *infra.*

### B.

As to the second prong of *Cuyler*, the majority adopts the panel's statement of our circuit's test for adverse effect.[6] While I agree that this test is faithful to our prior decisions, I also recognize that an unwary court could apply it in a way that effectively requires the habeas petitioner to prove prejudice. The following observations on the application of our test will help courts to avoid this possibility.

When a habeas petitioner is required to show prejudice in order to establish a claim of ineffective assistance of counsel, that petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). As the majority claims to recognize, however, prejudice is presumed for ineffective assistance claims that are based on a lawyer's conflict of interest and that meet the two-prong *Cuyler* test. In the conflict of interest context, therefore, we are forbidden from rejecting an ineffective assistance claim simply because we think that the petitioner probably would be found guilty if tried again.

Instead of a prejudice inquiry, we apply the three-part test outlined by the majority in order to determine whether the actual conflict of interest alleged by the petitioner "adversely affected his lawyer's performance." *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067 (quoting *Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718); *accord McConico,* 919 F.2d at 1548 ("A petitioner need not show that the result of the trial would have been different without the conflict of interest, only that the conflict had some adverse effect on counsel's performance."); *LoConte v. Dugger,* 847 F.2d 745, 754 (11th Cir.1988). As the Supreme Court has recognized, however, "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067.[7] As a

---

**6.** This test consists of three requirements. In summary, a habeas petitioner must:

1) point to some plausible alternative defense strategy or tactic that might have been pursued;
2) demonstrate that the alternative strategy or tactic was reasonable under the facts; and
3) show some link between the actual conflict and the decision to forgo the alternative defense strategy (i.e., establish that the alternative was inherently in conflict with or not undertaken due to the lawyer's other loyalties or interests). *See Freund,* 117 F.3d at 1579–80.

**7.** The source of this measuring difficulty provides a powerful rationale for our presumption of prejudice. As we recognized in *Duncan v. Alabama,* the harm caused by conflicting interests "is difficult to measure because the harm 'is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible

pretrial plea negotiations and in the sentencing process.'" 881 F.2d 1013, 1016 (11th Cir.1989) (quoting *Holloway v. Arkansas,* 435 U.S. 475, 490, 98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978)). Of course, the harm may also lie in what the advocate actually does when pursuing a certain strategy that he might not have done under an alternative strategy; this type of harm is also difficult to measure. Given this difficulty, we are not supposed to engage in "unguided speculation" in either of these situations (or both situations together) in order to quantify the degree to which the actual representation received by the petitioner differed from the representation that he hypothetically could have received if represented by conflict-free counsel. *See Holloway,* 435 U.S. at 491, 98 S.Ct. at 1182 (concluding that the concepts of prejudice and harmless error are inapplicable in the conflict of interest con-

result, once an actual conflict of interest has been shown, we must be careful to apply our test for adverse effect to the petitioner's case as it stood before it was tainted by the lawyer's conflict. For example, in applying our second requirement that the alternative defense strategy or tactic must be "reasonable under the facts," the decisive "facts" upon which we rely cannot be drawn from a trial record (or from a pre-trial statement) that was made *after* the time that the petitioner's case became tainted. We would slip dangerously close to a prejudice inquiry if we tried to pinpoint tainted "facts" by hypothesizing whether or not the evidence offered at trial would have been the same even if conflict-free defense counsel had followed an alternative strategy.

A *de facto* prejudice inquiry can also insinuate itself into our adverse effect test in another way. With regard to our third requirement that the petitioner must link his lawyer's actual conflict with the lawyer's decision to forgo an alternative defense strategy, the danger lies in the following question: at what point in the representation should a court find that the lawyer has made such a decision? In order to avoid this danger, a decision must be deemed conclusively made at the first moment that the lawyer, influenced by an actual conflict of interest, elects to forgo a reasonable alternative strategy. Once this election has been made, the taint of the lawyer's conflict of interest irrevocably has affected the petitioner's case. If we instead imported an element of "cure" into this linkage requirement by asking whether the lawyer subsequently reversed her election (in whole or part) and, if so, whether this reversal was sufficient to purge the taint, we would indulge in unguided speculation in order to determine whether her initial tainted election ultimately was harmless. We cannot truthfully measure what the lawyer's sequence of choices has cost the petitioner, and that is why this type of inquiry into prejudice is forbidden.

In sum, the distinction between our test for "adverse effect" in the conflict of interest context and our test for "prejudice" in other

ineffective assistance contexts has an important purpose. *See supra* note 7. We should therefore implement these tests carefully, in accordance with the foregoing observations, in order to ensure that the distinction does not become merely semantic.

## II.

### A.

In light of the problems and potential pitfalls identified in part I, it is necessary to revisit the majority's determination that the facts of Freund's case do not meet either the actual conflict or adverse effect prongs of *Cuyler*. It would be possible to undertake this task by articulating an alternative test for actual conflict and mechanically applying this test—along with the above test for adverse effect—to the facts underlying Freund's case in order to determine whether he was denied the effective assistance of counsel. This approach, however, has two significant drawbacks. First, it is difficult to articulate a reasoned basis for disagreeing with a court's decision to apply (or not to apply) abstract labels, such as those that appear in our prior cases interpreting *Cuyler*, to a given set of facts without a clear appreciation of the ethical and constitutional policies underlying the labels. This difficulty is illustrated by the majority's disagreement with the panel's conclusion that the law firm's prior representations of Trent were "substantially related" to its later representation of Freund. Second, it is important to note that two of the three sources of actual conflict alleged by Freund—the law firm's prior representation of Trent and Trent's allegations against the firm's members—do not correspond to either of the two traditional contexts in which we have interpreted *Cuyler*. We would need to be quite cautious, therefore, in applying any test derived from our prior cases interpreting *Cuyler* to the present facts. *See supra* part I (introduction).

A more informative approach that avoids these drawbacks begins with a look over the law firm's shoulder at the time when its

text). Such speculation regarding the cost of the conflict of interest to the petitioner is not "sus-

ceptible of intelligent, evenhanded application." *Id.* at 490, 98 S.Ct. at 1182.

members decided to represent Freund. As part II.B. explains, this look reveals that the law firm initially faced two ethically-based conflicts of interest that burdened its representation of Freund. As described in part II.C., a third conflict of interest arose after the firm began to represent Freund that exacerbated this burden. Part III then returns to our prior cases interpreting *Cuyler* in order to determine whether any of these cases forecloses a finding that Freund's lawyers, burdened as they were by these conflicts of interest, provided ineffective assistance to Freund.

### B.

#### 1.

In deciding to represent Freund, the law firm of Foley, Colton & Duncan, P.A., faced a difficult dilemma because of its prior representations of Trent and Mills. As counsel to Freund, the firm had a duty to provide him with the competent representation to which he was entitled under the Sixth Amendment. In discharging this duty, of course, the firm's lawyers had an obligation to obey Florida's rules of legal ethics. One relevant ethical obligation was the firm's duty under Canon 7 of the former Florida Code of Professional Responsibility[8] to represent its client zealously. This duty requires that a lawyer "be loyal to her client and ensure that every professional decision she makes on behalf of the client is in the client's best interests." *Freund*, 117 F.3d at 1572. A lawyer who intentionally prejudices or harms the interests of her client violates this duty. *See* Fla.Code of Professional Responsibility DR 7–101(A)(3) (1986).

A second ethical obligation was the firm's duty under Canon 5 of the Florida Code to "exercise independent professional judgment on behalf of a client." Fla.Code of Professional Responsibility, Canon 5 (1986). A lawyer is required to avoid conflicts of interest in order to fulfill this duty. *See Barclay v. Wainwright*, 444 So.2d 956, 958 (Fla.1984). Therefore, a lawyer is prohibited from representing a potential client when the lawyer's professional judgment will be, or reasonably may be, affected by his "own financial, business, property, or personal interests," unless the client gives his informed consent. Fla. Code of Professional Responsibility DR 5–101(A) (1986). In addition, a lawyer is prohibited from representing a new client if that representation is likely to have an adverse effect on the lawyer's judgment on behalf of another client, unless both clients give their informed consent. *See* Fla.Code of Professional Responsibility DR 5–105(A), (C) (1986).[9]

While the firm owed these two ethical obligations to Freund alone, it owed a third ethical obligation to Freund as well as to its former clients Trent and Mills. This obligation was the firm's duty of confidentiality under Canon 4 of the Florida Code, which requires a lawyer to "preserve the confidences and secrets of a client." Fla.Code of Professional Responsibility, Canon 4 (1986). The term "confidences" refers to information protected by the attorney-client privilege, while the term "secrets" refers to other information gained during the professional relationship "that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." Fla.Code of

8. At the time of Freund's trial, members of the Florida Bar were governed by the Florida Code of Professional Responsibility. The Florida Code was replaced in 1987 by Chapter 4 of the Rules Regulating the Florida Bar, entitled "Rules of Professional Conduct." *See Freund*, 117 F.3d at 1572.

9. The Rules Regulating the Florida Bar currently provide more detailed restrictions relating to a lawyer's duty to exercise independent professional judgment. For example, the rules prohibit a lawyer from representing a client if the exercise of the lawyer's professional judgment "may be materially limited by the lawyer's responsibilities to another client or to a third person or by the lawyer's own interests," unless the lawyer reasonably believes that he can represent the client and the client consents after consultation. Rules Regulating the Fla. Bar 4–1.7(b) (1994). With respect to conflicts of interest involving former clients, Rule 4–1.9(a) provides that a lawyer who has represented a former client in a matter must not later "represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation." Rules Regulating the Fla. Bar 4–1.9(a) (1994).

Professional Responsibility DR 4–101(A) (1986). Because of this duty, a lawyer could be subject to discipline for revealing a client's confidences or secrets or for using them either to the disadvantage of the client or for the benefit of the lawyer or a third person without the client's informed consent. *See* Fla.Code of Professional Responsibility DR 4–101(B) (1986); *Ford v. Piper Aircraft Corp.*, 436 So.2d 305, 307 (Fla. 5th DCA 1983); *see also* Rules Regulating the Fla. Bar 4–1.9(b) (1994).[10]

The duty of confidentiality affords broad protection to a client's confidences and secrets. *See Buntrock v. Buntrock*, 419 So.2d 402, 403 (Fla. 4th DCA 1982) (noting that protection is broader than attorney-client evidentiary privilege). This protection "exists without regard to the nature or source of information or the fact that others share the knowledge." Fla.Code of Professional Responsibility EC 4–4 (1986). The protection is also perpetual; a lawyer must forever preserve the confidences and secrets of every client, whether ongoing or former. *See* Fla. Code of Professional Responsibility EC 4–6 (1986); Rules Regulating the Fla. Bar 4–1.9(b) (1994); *State Farm Mut. Auto. Ins. Co. v. K.A.W.*, 575 So.2d 630, 632 (Fla.1991).

In deciding to accept Freund as a client, the firm was required to determine that it could represent him without violating any of the above ethical obligations that it owed him. Given that it had previously represented two people—Trent, Freund's co-defendant, and Mills, a witness for the prosecution in Freund's case who could have been charged with several crimes arising from her participation in the events surrounding Walker's murder[11]—with interests materially adverse to Freund's interests, however, the firm faced a substantial likelihood that its ethical obligations to Freund would come into direct and irreconcilable conflict with its ethical obligations to its former clients.[12] The initial question that must be answered in order to determine the significance of the firm's potential ethical conflict to our Sixth Amendment analysis under *Cuyler* is this: does a lawyer's Sixth Amendment duty to provide its current client with competent representation require it to disregard the rules of ethics governing its conduct with respect to its former clients if to do so would benefit its current client? If the answer to this question is yes, then we need not inquire further into the issue of whether the firm actually was confronted with conflicting ethical obligations in this case; if faced with such a conflict, the firm would simply be forced to ignore its ethical duties to its former clients. If the answer is no, however, we should proceed to determine whether the firm actually faced conflicting ethical obligations in this case that adversely affected its representation of Freund.

It seems clear that this initial question must be answered in the negative. If we were to conclude that the Sixth Amendment required lawyers to violate their ethical obligations to former clients in order to provide competent representation to their current

---

10. The Code did allow a lawyer to reveal a client's confidences or secrets in two limited situations, neither of which is relevant in this case. *See* Fla.Code of Professional Responsibility DR 4–101(D) (1986) (providing that a lawyer may reveal a client's (1) confidences or secrets when ordered to do so by a tribunal after exhausting appellate remedies or (2) intent to commit a crime).

11. For a list of the crimes with which Mills could have been charged, see *Freund*, 117 F.3d at 1553 n. 16.

12. The three ethical duties discussed above can place conflicting obligations on a lawyer in certain circumstances. For example, when a current client's interests are adverse to the interests of a former client whom the lawyer represented in a related matter, the lawyer's duty to represent the current client zealously and his duty to preserve the confidences and secrets of the former client may become irreconcilable. It is quite likely that the lawyer obtained information in the former representation that could be useful in the current representation. *See Duncan v. Merrill Lynch, Pierce, Fenner & Smith*, 646 F.2d 1020, 1027 (5th Cir. Unit B June 1981) ("Whenever an attorney seeks to represent an interest adverse to that of a former client, the possibility arises that the attorney, whether intentionally or inadvertently, will reveal to his present client confidential information entrusted to him during his previous representation."). If the lawyer used this information in representing his current client, he would violate his ethical obligation of confidentiality to his former client. If he refrained from using the information, however, he would violate his duty zealously to represent his current client.

clients, lawyers who heeded our conclusion would be barraged with lawsuits by their former clients and would face state bar disciplinary proceedings. Irrespective of whether these actions were successful,[13] the public's confidence in the ability of the legal profession to hold secrets in confidence would be irreparably damaged. The ability of the states to promulgate effective ethical standards in order to regulate the conduct of lawyers would also be substantially undermined. *See Duncan,* 646 F.2d at 1027 (describing, in the civil disqualification context, the adverse consequences of allowing an attorney to reveal the confidences of his former client). Such consequences are not lightly to be presumed, and there is no reason to assume that they are warranted by the Sixth Amendment.

## 2.

The firm, therefore, could not ignore its ethical obligations to its former clients in attempting to provide Freund with competent representation that was consistent with its ethical obligations to him. In order to determine whether the firm's representation of Freund was burdened by its ethical obligations to Trent and Mills, we should ask two questions. First, we should consider what defense strategies or tactics a competent lawyer not burdened by ethical obligations to Trent and Mills would have considered. Second, we should ask whether a competent lawyer with ethical obligations to Trent and Mills would conclude that his prior representation of these clients in any way restricted—or even foreclosed—his ability to use any of these strategies in representing Freund.

**13.** It is possible that lawyers would be able to invoke their Sixth Amendment obligation to their client as a defense in these actions.

**14.** Fullerton was subject to prosecution for his role in concealing the crime. For a list of the crimes with which the other three people could have been charged, see *Freund,* 117 F.3d at 1553 n. 16.

**15.** In Florida, the crime of murder in the first degree includes a premeditated killing and a killing "committed by a person engaged in the perpetration of, or in the attempt to perpetrate," certain felonies, including kidnapping. *See* Fla. Stat. ch. 782.04(1)(a)(1), (2)(f) (Supp.1984). The contention that Freund was under Trent's dominion and control could support an argument that

At the beginning of Freund's case, just prior to the time that his lawyer Robert Foley announced that Freund would rely on an insanity defense, an unburdened and competent lawyer could have chosen to follow any of the following four reasonable defense strategies. First, the lawyer could have attempted to obtain a plea bargain for Freund in exchange for Freund's cooperation in the State's prosecution of the other people who either were present on the night of the murder or helped to conceal the crime—Mills, Angelilli, Daniell, and Fullerton.[14]

A second possible strategy was to rely on an insanity defense and thus effectively admit that Freund murdered Ralph Walker. Given the significant brain damage that Freund sustained as a result of his 1983 suicide attempt, which caused symptoms such as reduced ability to reason and appreciate the consequences of his actions, *see Freund,* 117 F.3d at 1548, this strategy had some basis in fact. As Freund's attorneys informed him long after they had already elected to rely on an insanity defense, however, such a defense did not have a high probability of success. *See Freund,* 117 F.3d at 1568.

Third, competent counsel could have implicated Trent indirectly in Walker's murder by contending that Freund killed Walker but lacked the criminal intent to commit murder because he was under the dominion and control of Trent, who ordered the killing and knew that Freund, because of his mental state, would carry out the order.[15] Freund's

Freund's killing of Walker was not premeditated, as well as an argument that Freund lacked the necessary intent to commit kidnapping. *See Freund,* 117 F.3d at 1580 n. 89.

If Freund ultimately was convicted under the felony-murder portion of the statute, this contention could also support an argument that Freund could not receive the death penalty because he did not act either with the intent that Walker die or with reckless disregard for Walker's life. *See Enmund v. Florida,* 458 U.S. 782, 798, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982) (intent); *Tison v. Arizona,* 481 U.S. 137, 157–58, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987) (reckless disregard).

brain damage would also have provided support for this contention.

A fourth possible strategy was to contend that Trent, not Freund, personally killed Walker.[16] This strategy of directly implicating Trent in Walker's murder was supported by several facts, all of which a competent lawyer could have learned quite early in the case under the liberal discovery regime that applies to criminal cases in Florida.[17] Before Freund arrived on the night of the murder, for example, Trent actually shot at Walker and missed. *See Freund,* 117 F.3d at 1550. All of the physical evidence in the case implicated Trent, and all three of the State's principal fact witnesses at Freund's trial testified that Trent was in control of everything that transpired on the night of the murder. *See id.* at 1567, 1581. Moreover, Trent harbored strong negative race-based feelings toward Walker that certainly played a part in the events leading up to the murder and provided him with a motive for the murder itself;[18] there was no indication, however, that Freund had any such feelings. The only evidence directly implicating Freund was Angelilli's uncorroborated testimony that she saw Freund making stabbing motions with Trent's knife, but she also testified that she

could not see where the knife landed.[19] *See id.* at 1552, 1567.

Freund's lawyers, bearing ethical obligations to Trent and Mills, took little time to gather evidence and consider which of these options they would pursue. Only two or three days after Freund's arraignment, the lawyers deliberately locked their client into one of these options by calling a press conference to announce that Freund would rely on an insanity defense. This defense had the potential to relieve both Freund and Trent of liability for first-degree murder: Trent because he did not commit the murder, and Freund because he was insane when he killed Walker. *See Freund,* 117 F.3d at 1556 & n. 27. A question therefore arises regarding whether the firm's decision to pursue this defense was influenced by its ethical obligations to Trent.

It is readily apparent that competent lawyers who bore ethical obligations to Trent would never have taken Freund's case. Such lawyers undoubtedly would have concluded that their ability to choose among the above options solely in accordance with Freund's best interests, as required by their ethical duty of zealous representation, was restricted by their ethical obligations to Trent. Specifically, the ethical obligation of confidentiality

16. This strategy was not foreclosed by Freund's confession to his lawyers and psychiatrist. *See infra* part III.B.1.

17. *See* Fla. R.Crim. P. 3.220. For example, this rule states that after the filing of an indictment or information, "the defendant may take the deposition upon oral examination of any person who may have information relevant to the offense charged."

18. These facts do not appear in the majority opinion. As the panel noted in its discussion of the events leading up to the murder, *see Freund,* 117 F.3d at 1550–51, Walker (who was African–American) began whispering to Angelilli that he wanted to have sex with her. When she ignored him, Walker became upset and loudly demanded sex. Trent then told Mills, who ran a female escort service, to "call up one of your girls and get a black girl over here for Ralph [Walker]." Mills, afraid to put any of "her girls" in danger, pretended to make the call and told Trent that she could not reach anyone. Walker then went into Trent's bedroom and returned with an aluminum baseball bat, which he slammed onto a table with such force that he dented the bat. He

said that Trent would just have to "ignore this," but he was going to have sex with Angelilli. Walker then grabbed a .357 magnum pistol from the table and came toward Angelilli with the gun in one hand and the bat in the other. Trent knocked the .357 magnum away and shot at Walker with a .45 pistol, but the bullet hit a dining room chair. Trent then pointed his gun at Walker, handcuffed him, and yelled threats of death—accompanied by racial epithets—at him. *One of the threats that Trent yelled was:* "You're dead Ralph Walker! You're dead, nigger, and you're goin' home to your mama in a box." Trent then called Bruce Fullerton (one of his henchmen) and asked him to bring a steamer trunk, a sledgehammer, and a chain saw to Trent's apartment. Fullerton apparently ignored these instructions. Later in the evening, Trent used racial epithets again when he repeatedly confided to Daniell (one of Trent's employees) that he had always had a fantasy of killing a man of Walker's race and then sodomizing the man's body.

19. Of course, there was also evidence that Trent had kicked Walker, lunged at Walker with his knife, and yelled threats of death at Walker earlier in the evening. *See Freund,* 117 F.3d at 1550.

that Freund's lawyers owed Trent restricted their ability to claim either that Trent killed Walker or that Freund killed Walker while he was under Trent's control. This obligation also restricted their ability to obtain any significant concessions for Freund in a plea bargain with State prosecutors. In order to understand why, it is necessary to examine the nature and scope of the firm's prior representation of Trent.

Trent had a long-standing and wide-ranging legal relationship with the firm. The firm's lawyers represented Trent in a broad range of civil and criminal matters from the early 1970s until 1984; they also represented his mother's estate. Trent referred many of his employees and friends who needed legal representation to the firm, including Eleanor Mills. The relationship between Trent and the firm was also deeper than that of attorney and client. Trent became a fixture at the law firm's offices, and his employees came to the offices often in order to use the firm's copier and other office equipment. Trent also performed interior design work for the offices, as well as for Foley and Colton and the parents of Duncan.

Two of the criminal prosecutions in which the firm represented Trent were particularly relevant to the firm's later representation of Freund. In 1983, Trent allegedly brandished a gun on a public street and threatened to kill two people. When the police stopped Trent's car a few days later in order to arrest him on assault charges, they found the drugs diazepam—a drug that was in Walker's bloodstream when he died—and methaqualone in Trent's possession. Trent was charged with drug possession and aggravated assault, and the State initiated a forfeiture proceeding against Trent's car in relation to the possession charge. The firm represented Trent during the entire forfeiture proceeding. In the criminal prosecutions, the firm ultimately withdrew as counsel in May 1984 after filing several pretrial motions and appearing in court on Trent's behalf.

This extensive history of representation meant that the firm still owed Trent an extensive ethical obligation of confidentiality during its representation of Freund. The firm thus was prohibited, *inter alia*, from disclosing any information ·it gained during its professional relationship with Trent if such disclosure was likely to be detrimental to Trent. This prohibition was particularly broad in light of the wealth of potentially detrimental information that the firm gained while representing Trent. Trent himself admitted, in his testimony at the hearing held on his motion to sever his and Freund's prosecutions for separate trial, that he disclosed his participation in multiple criminal activities involving drugs and prostitution to members of the firm after they advised him that all communications would be completely confidential. Trent also discussed with the lawyers his sexual exploits and his use of sexual devices such as handcuffs—a device that Trent used to restrain Walker prior to the murder. Furthermore, it is appropriate to assume that the firm, ethically bound to act as competent and zealous counsel to Trent in the drug and assault prosecutions, obtained all information from its client that would have been helpful in working out a plea agreement and, in the event of Trent's conviction, in presenting an effective argument at sentencing. A competent lawyer eliciting this information, for example, would seek to gain an indepth appreciation of the good and bad sides of Trent's character, including his past criminal activity, in order to avoid surprises and be prepared to make the best possible arguments on his client's behalf.

This broad confidentiality obligation seriously hampered the firm's ability convincingly to implicate Trent in Walker's violent murder—whether by arguing that Trent personally killed Walker or that Freund did so while under Trent's control—by limiting its ability to present to a jury evidence of Trent's sexual proclivities and history of violence, diazepam possession, and other criminal conduct.[20] The firm also would be

---

**20.** While such information regarding prior bad acts generally is not admissible solely to prove propensity or bad character, conflict-free counsel could have used it to prove things such as mo-

tive, opportunity, intent, knowledge, or identity. *See* Fla. Evid.Code § 90.404(2). In addition, even if this information could not have been offered as evidence, it could have been used by

unable to cross-examine Trent effectively regarding these matters in the event that he was tried jointly with Freund. Even if they were tried separately, as they ultimately were, the firm would be unable to use anything it learned in its prior representation of Trent to throw blame on him.

The firm's broad confidentiality obligation to Trent also constrained its ability to negotiate a favorable plea agreement for Freund. *See United States v. McLain,* 823 F.2d 1457, 1464 (11th Cir.1987) (citing *Holloway v. Arkansas,* 435 U.S. 475, 490, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978)) ("Exploring possible plea negotiations is an important part of providing adequate representation of a criminal client, and this part is easily precluded by a conflict of interest."). In seeking such a plea agreement, competent lawyers for Freund certainly would have attempted to convince State prosecutors that Trent, not Freund, was the person most worthy of punishment for Walker's murder. Providing prosecutors with information on Trent's long history of violence and criminal conduct would have been a very persuasive method of accomplishing this goal. Because the firm that represented Freund had an obligation of confidentiality that prevented it from disclosing information likely to be detrimental to Trent, however, it could not use this method.

Clearly, therefore, the firm's decision regarding how best to defend Freund was burdened from the start by its ethical obligations to Trent. The firm's representation of Freund was also burdened, albeit less severely, by its prior representation of Mills. While this latter burden did not affect the firm's decision to pursue an insanity defense rather than one of the other strategies discussed above, it did affect the firm's tactics in cross-examining Mills—a key prosecution witness at Freund's trial.

The firm's representation of Mills related to Mills' arrest in early 1984 for attempting to sell a kilogram of cocaine to an undercover police officer.[21] In April 1984, several weeks before the murder, Trent met Mills and offered to help her in two ways with the cocaine trafficking charges that she was facing. First, he discussed having her serve as an informant for the local police. Second, he referred Mills to the firm for representation on the charges. Mills then met with Roger Colton at Trent's apartment to seek legal advice on the charges, and she discussed the facts and circumstances surrounding the charges with Colton. *See Freund,* 117 F.3d at 1577 n. 82.

Because it was apparent from the beginning of Freund's prosecution that Mills would be a prosecution witness, the firm was faced with a dilemma. In consulting with Mills about her cocaine trafficking charges, the firm very likely obtained information that it could use to impeach her testimony on cross-examination. For example, the record strongly suggests that the firm learned that Mills frequently used cocaine. The firm certainly also learned that Mills was a friend of Trent and that Trent was trying to help her avoid jail time through cooperation with the police. While cross-examining Mills on these issues would raise questions as to her credibility and pro-Trent bias and thus aid Freund's defense, it would also violate the firm's continuing ethical obligation of confidentiality to Mills.[22] Douglas Duncan ultimately did cross-examine Mills about her trafficking charges and Trent's assistance, but he stopped short of having Mills admit that Trent had referred her to his law firm for representation. Because a conflict-free lawyer could have elicited this fact in order to discredit Mills and suggest bias, it is clear that the firm's ethical obligation of confidentiality to Mills also burdened its representation of Freund.

3.

As the above discussion demonstrates, Freund's lawyers faced conflicting ethical ob-

conflict-free counsel in effectively deposing Trent or cross-examining him at trial.

**21.** Mills testified at Freund's trial that she was trying to sell four kilograms of cocaine. The undercover police officer requested and received only one kilogram, for which he was to pay about $37,000. Mills' serious drug offense carried a mandatory minimum sentence of fifteen years imprisonment and a $250,000 fine. *See* Fla. Stat. ch. 893.135(1)(b)1.c. (1995).

**22.** Contrary to the majority's suggestion, this obligation of confidentiality was not waived by Mills. *See infra* part III.A.2.; *see also Freund,* 117 F.3d at 1578 n. 83.

ligations from the moment that they began representing Freund. On the one hand, the firm's obligations to represent Freund zealously and exercise independent professional judgment on his behalf meant that all of its professional decisions had to be in Freund's best interests and untainted by conflict of interest. On the other hand, its obligations of confidentiality to Trent and Mills placed a heavy burden on its ability to implicate Trent in Walker's murder, to obtain a favorable plea bargain for Freund, or to impeach Mills' testimony on cross-examination by suggesting bias. Not surprisingly, therefore, the firm decided quite early in its representation of Freund not to pursue any of these strategies.[23] Given that the firm's ethical dilemmas restricted the strategies that it could use in defending Freund, the conclusion seems inescapable that an "actual conflict" of interest "adversely affected" the firm's performance in representing him. How, then, could we conclude under *Cuyler* that Freund was not denied his Sixth Amendment right to the effective assistance of trial counsel as a result of the firm's ethically-based conflicts of interest? Three possibilities deserve mention.

First, it could be noted that our precedent clearly establishes that a violation of state ethical rules by a criminal defense lawyer does not necessarily deprive his client of the effective assistance of counsel. *See Freund,* 117 F.3d at 1572 n. 66 (citing *Lightbourne,* 829 F.2d at 1023 n. 12). In this case, however, we do not merely have a violation of state ethical rules—we have a *conflict* between the ethical obligations that certain lawyers simultaneously owed to their current and former clients. When the law of ethics renders a lawyer unable to reconcile the duties he owes to separate clients, our precedent is consistent with the conclusion that the lawyer has an actual conflict of interest. *See supra* note 4.

A second argument could be made that the adverse effect of these ethically-based conflicts on the firm's representation of Freund was *de minimis*. As to Mills, one could claim that Duncan's cross-examination was sufficient to impugn her credibility and suggest bias without revealing the fact that Trent referred her to Duncan's firm. As to Trent, it could be claimed that any adverse effect Freund suffered because the law firm's ethical obligations led it initially to disregard the option of implicating Trent in Walker's murder was later cured in the course of Freund's prosecution. As the prosecution unfolded, for example, the cases against Trent and Freund were severed for trial, Trent pled guilty after a mistrial and did not testify against Freund, Duncan indirectly implicated Trent in Walker's murder during his portion of the firm's closing argument to the jury at Freund's trial, and Foley directly implicated Trent during his portion of the closing argument. Both of these claims, however, commit a fundamental mistake: they put the judge in the role of a "Monday morning quarterback" who must determine whether Freund was prejudiced by the firm's ethical conflicts. As explained in part I.B., *supra,* this type of inquiry is forbidden; prejudice is presumed once actual conflict and adverse effect have been established.

Finally, it could be claimed that these two ethical conflicts of interest did not establish an "actual conflict" that "adversely affected" Freund's case as required by our precedents that have interpreted *Cuyler* in other contexts. For example, one could argue that we should hold mechanically that the firm's prior representations of Trent were not "substantially related" to its later representation of Freund, or that the firm did not actually learn confidential information during its representation of Mills that was relevant to Freund's case. Such contentions are addressed in part III, *infra.*

**23.** Ultimately, however, the firm did implicate Trent indirectly in Walker's murder during Freund's trial. In addition, Freund's lawyer Robert Foley suggested in his closing argument to the jury at Freund's trial that Trent may have personally committed the murder and then told Freund that it was Freund who did it; this belated suggestion obviously was inconsistent with the

firm's defense strategy of claiming that Freund had committed the murder but was insane. For a discussion of why these changes in defense strategy do not alter the conclusion that the firm's ethically-based conflict of interest adversely affected its representation of Freund, see part III.B.1. and note 41, *infra.*

## C.

The two ethically-based conflicts of interest discussed above were not the only conflicts that adversely affected the firm's representation of Freund. A third conflict, rooted in the firm's own interests rather than in its ethical obligations to a third party, arose after the firm's representation of Freund had already begun. This conflict strongly reinforced the firm's initial aversion, rooted in the ethical duty of confidentiality that it owed Trent, to a defense strategy of implicating Trent in Walker's murder.

This third conflict grew out of a hearing held to determine whether to grant Trent's motion to sever the murder prosecutions of Trent and Freund for separate trial. The main ground for Trent's motion involved the ethical conflict discussed above that arose from the firm's prior representation of Trent: the law firm had acquired confidential information during this representation that it could use to Trent's detriment at trial. While the firm (on Freund's behalf) initially supported severance, it later joined the State in resisting a separate trial. *See Freund,* 117 F.3d at 1557 & n. 29, 1559. Trent, presumably upset by his former law firm's opposition to severance and by the prospect that it might use his confidences against him, testified at the severance hearing. He began by detailing the attorney-client relationship that had developed between himself and the firm. During the course of the representation, Trent had confided to Foley and Colton his personal secrets, business affairs, and participation in multiple criminal activities involving drugs and prostitution. Moving to a description of his personal relationship with Foley and Colton, Trent made several serious allegations against both lawyers. He claimed to have delivered cocaine to their friends, sometimes at the firm's offices. He also claimed to have provided both men with prostitutes on many occasions, often as payment for legal services. Finally, he alleged that both lawyers had attended and participated in many of his "sex parties" involving cocaine and prostitutes. In light of these allegations, the firm again changed its position on severance and argued that the "delicate nature" of the ethical rules pertaining to conflicts of interest made cross-examination of Trent inappropriate. Over the State's opposition, the trial judge then granted a severance.

These allegations gave the firm a strong additional incentive to continue with Freund's insanity defense, which it had publicly adopted quite early in the representation (and thus could not easily reject in any event), rather than either use a defense in Freund's separate trial that would implicate Trent or obtain a plea agreement for Freund that would adversely impact Trent. Trent had made it quite clear that he would respond to any attempt by the law firm to harm his interests. The next such attempt certainly could have incited Trent to produce evidence in support of his charges, which could have resulted in Foley and Colton being disciplined by the Florida Bar or prosecuted by the State. It is not surprising, therefore, that Freund's lawyers presented an insanity defense at trial.

While it is true that Freund's lawyer Robert Foley eventually did suggest in his closing argument at Freund's trial that Trent may have committed the murder and then told Freund that it was Freund who did it, this fact does not belie the proposition that Trent's allegations helped convince the law firm to continue pursuing an insanity defense.[24] By the time of Freund's trial, Trent had already pled guilty to second-degree murder following a mistrial. Therefore, Foley's spontaneous musings in closing[25] no

---

24. This point also applies to Duncan's claim, made during his portion of the firm's closing argument at Freund's trial, that the evidence indirectly implicated Trent in Walker's murder.

25. Foley's comments were unsupported by any evidence that Trent may have murdered Walker. When questioned at the hearing held on Freund's motion to vacate the judgment and sentence in his case pursuant to Fla. R.Crim. P. 3.850, Dun-

can indicated that Foley's statement was not a planned part of the firm's defense of Freund. Duncan admitted that he was shocked when Foley made the statement and that the statement hindered Freund's insanity defense. Duncan testified that he later asked Foley why he had made the statement; Foley answered that he did it to "appease" Freund's mother.

longer had the potential to harm Trent's interests.

### III.

As the above discussion has demonstrated, Trent's allegations and the firm's conflicting ethical obligations imposed significant restrictions on the firm's ability to pursue certain reasonable tactical options that conflict-free counsel could have used in defending Freund. In other words, the use of these options would have conflicted with the firm's "other loyalties" (its ethical obligations to Trent and Mills) and "interests" (in avoiding any potentially harmful consequences of Trent's allegations). *Freund,* 117 F.3d at 1580 (quoting *United States v. Fahey,* 769 F.2d 829, 836 (1st Cir.1985)) (noting that in order to establish adverse effect, a habeas petitioner must demonstrate that a reasonable alternative defense strategy or tactic that might have been pursued "was inherently in conflict with ... the attorney's other loyalties or interests"). The firm thus decided early in its representation of Freund that it would not pursue these options. It seems clear, therefore, that an "actual conflict" of interest "adversely affected" the firm's performance in defending Freund. This part considers whether any of our prior cases interpreting *Cuyler* forecloses a finding that Freund's lawyers, burdened as they were by the conflicts of interest discussed above, provided ineffective assistance to Freund.

The organizational scheme of this part deliberately tracks the majority's analysis of the merits. *Ante* at part IV.C. Part III.A. reviews the three separate sources of actual conflict demonstrated by Freund. Part III.B. then examines two adverse effects that can be linked to these conflicts.

### A.

#### 1.

The majority rejects the claim that the firm, in representing Freund, faced an actual conflict of interest because of obligations arising from its long history of representing Trent. Assuming *arguendo* that the majority is correct to analyze this claim by applying its problematic interpretation of *Smith* [26] solely to the firm's prior representation of Trent on the assault and diazepam possession charges,[27] it is apparent that the result of the majority's analysis is not supported by our precedents.

Under the majority's view of *Smith,* a habeas petitioner may be able to demonstrate an actual conflict of interest if he first establishes that "counsel's earlier representation ... was substantially and particularly related to counsel's later representation of the defendant." *Smith,* 815 F.2d at 1405. The *Smith* court derived this "substantially and particularly related" test primarily from our prior cases addressing the standard for disqualifying a lawyer in a civil matter concerning a former client, as well as from ABA Model Rule of Professional Conduct 1.9. *See id.* at 1406 n. 2; *see also* note 9, *supra* (quoting Florida's equivalent rule of professional conduct). The majority also relies in part on a civil disqualification case to support its determination that the assault and diazepam possession charges on which the firm previously represented Trent were not "substantially and particularly related" to its representation of Freund. As the following discussion shows, however, our civil disqualification jurisprudence does not support the majority's conclusion.

The essential thrust of the majority's argument is that the similarities between the

**26.** As explained previously, it is problematic for the majority mechanically to apply *Smith*—and our other cases interpreting the two elements of the *Smith* test—to Freund's argument that the firm's prior representation of Trent gave rise to an actual conflict of interest. It is also troubling that, despite our precedent to the contrary, the majority gives little weight to "other proof of inconsistent interests"—such as proof of conflicting obligations under the principles of legal ethics—as a means of establishing actual conflict

under *Smith. See supra* part I.A; *see also* note 4, *supra,* and accompanying text.

**27.** As revealed in part II.B.2., *supra,* the firm had an extensive relationship with Trent that extended well beyond these two prosecutions. As part of this relationship, the firm learned a great deal of information that was potentially detrimental to Trent. The majority's focus on the diazepam and assault prosecutions alone thus seems unduly narrow.

offenses involved in the firm's prior representation of Trent and its subsequent representation of Freund are not sufficient to establish a substantial relationship because "myriad factors differentiate the subject matter of each representation." *Ante* at 864. The majority cites two cases to support the general proposition that substantial relatedness exists when the prior and subsequent representations concern the very same events, criminal transactions, or subject matter. *Ante* at 864 (citing *United States v. Martinez*, 630 F.2d 361, 362 (5th Cir.1980); *Kraft, Inc. v. Alton Box Board Co.* (*In re Corrugated Container Antitrust Litig.*), 659 F.2d 1341, 1346 (5th Cir. Unit A Oct.1981)). Neither of these cases, however, support the proposition that substantial relatedness exists *only* in these situations. *See supra* note 4 (noting that the *Martinez* court applied a test more abstract than *Smith*'s substantial relatedness test); *see also Kraft*, 659 F.2d at 1346. In fact, the *Kraft* case provides a substantially broader definition of substantial relatedness in the civil disqualification context:

> The [past representation] does not need to be "relevant" [to the present action] in the evidentiary sense to be "substantially related." It need only be *akin to the present action in a way reasonable persons would understand as important to the issues involved.* The existence of a "substantial relationship" [in the case before the court] is self-evident. . . . Where parts of the present action and past representation concern the very same subject matter, reasonable minds must agree they are substantially related.

*Id.* (emphasis added). While sharing the same subject matter is thus sufficient to establish substantial relatedness, the *Kraft* court clearly states that it is not necessary. All that need be shown to establish substantial relatedness is that the past action reasonably could be understood as important to the issues involved in the present one.

Applying the *Kraft* definition to the facts of this case, it is apparent that the firm's prior representation of Trent on the assault and diazepam possession charges [28] reason-

---

**28.** The majority contends that Freund failed to introduce evidence at the Rule 3.850 hearing concerning the scope and nature of the firm's prior representation of Trent—including its representation of Trent on the assault and diazepam possession charges. Ante at 862–63. This failure, however, does not prevent us—just as it did not prevent the state judge who held the hearing—from considering facts concerning the firm's prior representation of Trent from three other sources: facts that the prosecutor elicited from witnesses who testified at the hearing, facts of which the state judge took judicial notice at the hearing, and facts that appeared in the record of prior state court proceedings relating to Freund's murder prosecution. The record of these proceedings became part of the record of the Rule 3.850 hearing by operation of law. *See* Fla. R.Crim. P. 3.850 ("If the motion *and the files and records in the case* conclusively show that the prisoner is entitled to no relief, the motion shall be denied without a hearing." (emphasis added)).

The federal statutory provision upon which Rule 3.850 is based is 28 U.S.C. § 2255 (1994). *See State v. Bolyea*, 520 So.2d 562, 563 (Fla. 1988) ("Rule 3.850 was taken nearly word-for-word from [section 2255], and we plainly have given the rule the same broad scope as its federal counterpart. Moreover, we explicitly have recognized federal precedent interpreting [section 2255] as persuasive authority in construing Rule 3.850." (footnote and citation omitted)). Like Rule 3.850, section 2255 requires the trial court to consider the record of prior proceedings in the case. *See* 28 U.S.C. § 2255 (1994) ("Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon. ..."); Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 7 advisory committee notes ("It is less likely that the court will feel the need to expand the record in a § 2255 proceeding ... because the trial (or sentencing) judge is the one hearing the motion (see Rule 4) and should already have a complete file on the case in his possession.").

Recognizing that the record of prior proceedings is properly before the court in a proceeding under Rule 3.850, Freund's Rule 3.850 motion quoted extensively from Trent's testimony at the severance hearing and from Mills' deposition testimony prior to Freund's trial. In responding to this motion, the State attached Mills' deposition and a portion of the transcript of Freund's trial as exhibits. During the hearing that ultimately was held on Freund's motion, the judge expressly made the pleadings, motions, and transcripts from Freund's prosecution a part of the record. The judge also took judicial notice of the court files on Trent's aggravated assault and diazepam possession prosecutions. After the hearing, several memoranda were filed by both parties that contained additional references to the record of prior proceedings in Freund's case and to the court files on Trent's prosecutions. It is plain, therefore, that this court also may refer to these materials.

ably could be understood as important to two issues involved in the firm's later representation of Freund. If the law firm chose to defend Freund by implicating Trent in Walker's murder, the information it learned in representing Trent on the diazepam possession charge would be useful in proving that Trent injected Walker with diazepam. Similarly, information that the firm learned in representing Trent on the assault charge would be useful in proving that Trent committed the violent killing. *See supra* part II.B.2. (describing information that the firm learned from Trent); *see also Freund*, 117 F.3d at 1576 n. 76 (discussing how this information could be used at Freund's trial or in a deposition of Trent). Clearly, therefore, the firm's prior representation of Trent and subsequent representation of Freund were substantially related under *Kraft*. While substantial relatedness is not always sufficient to establish an actual conflict of interest under the majority's view of *Smith*, it can—at the very least—be said that our precedent does not foreclose the conclusion that the firm faced an actual conflict of interest because of its prior representation of Trent.[29]

### 2.

Freund also argues that the firm's prior representation of Mills, who appeared as a prosecution witness in his trial, created an actual conflict of interest. Our precedent does not foreclose the conclusion that an actual conflict was created under *Smith* because the firm actually learned confidential information during its representation of Mills that was relevant in the firm's later representation of Freund.

When Mills consulted with the law firm at Trent's apartment regarding the cocaine

trafficking charge described in part II.B.2., *supra*, the firm certainly learned that Mills was a close friend of Trent and that Trent was helping her to avoid jail time through cooperation with the police.[30] These facts could have been used to suggest on cross-examination that Mills was biased in favor of Trent and thus was likely to accuse Freund falsely of Walker's murder in order to protect Trent.

The majority argues that even if the firm did learn relevant confidential information during its representation of Mills, the confidential nature of the information "ceased to exist" when Mills testified to "everything that she had told" the firm in a deposition taken by Trent's counsel in Duncan's presence prior to Freund's trial. *Ante* at 866. This argument is incorrect for two reasons. First, Mills' testimony did not relieve the firm from its duty of confidentiality to her. A lawyer remains bound by his duty of confidentiality "even though the same information is discoverable from other sources," *Buntrock*, 419 So.2d at 403, and "without regard to ... the fact that others share the [information]." Fla.Code of Professional Responsibility EC 4–4 (1986). Second, even if Mills' testimony could have operated to relieve the firm from its confidentiality duty as to the subjects she disclosed in the deposition, we still could not be sure that her deposition disclosures were actually coextensive with "everything that she had told" the firm. In fact, despite having supposedly disclosed everything she had told the firm in response to questions by Trent's counsel at her deposition, Mills then refused to answer any of Duncan's deposition questions on the ground that her prior consultation with the firm had established an attorney-client relationship. This refusal suggests that she did not fully

---

**29.** Because Freund has demonstrated that the firm's representation of him was substantially related to its prior representation of Trent, it is not necessary to refute the majority's argument that the firm did not learn confidential information during its representation of Trent that was relevant in the firm's later representation of Freund. *See supra* note 3. Nonetheless, it seems plain that the firm *did* learn relevant confidential information during its representation of Trent. *See supra* part II.B.2. (discussing the wealth of potentially detrimental information that the firm gained while representing Trent).

**30.** The majority again claims that Freund did little at the Rule 3.850 hearing to develop the historical facts surrounding the firm's consultation with Mills. As mentioned in note 28, *supra*, however, it is appropriate to glean these facts from evidence developed by the prosecutor at the hearing and from the record of prior state court proceedings in Freund's case. The majority ultimately does use these sources in setting out the facts surrounding the consultation. *Ante* at part IV.C.1.ii.

disclose everything that she had *told* the firm—much less all of the confidential information that the firm "actually *learned* ... during [its] prior representation of [Mills]," *Smith*, 815 F.2d at 1405 (emphasis added)—in answering the questions posed by Trent's counsel. Therefore, the information that the firm learned during its representation of Mills but that Mills did not disclose at her deposition certainly retained its confidential nature.

### 3.

Finally, Freund argues that the firm faced an actual conflict of interest because Trent's allegations at the severance hearing of embarrassing and illegal conduct by Foley and Colton gave the firm a strong incentive not to further antagonize Trent by implicating him in Walker's murder as part of Freund's defense. In order to respond to the majority's rejection of this claim, it is first necessary to determine the nature of our circuit's test for proving an actual conflict of interest in this context. The majority neglects to mention that the successive representation case of *Smith v. White*—which even the majority does not construe to apply beyond cases of actual conflict arising because "a criminal defendant's counsel previously represented a witness" [31] or a non-testifying, separately-tried co-defendant—is inapplicable in assessing this claim. Instead, cases such as *United States v. McLain*, 823 F.2d 1457 (11th Cir.1987), and *United States v. Fulton*, 5 F.3d 605 (2d Cir.1993), provide the proper framework for assessing claims that "the personal interests of the attorney and the interests of the client are in actual conflict." *Id.* at 609.

These cases support the proposition that actual conflict has been established when a lawyer's own personal interests would be compromised by pursuing a particular defense theory. *See McLain*, 823 F.2d at 1463–64 (finding actual conflict where defense counsel was under criminal investigation and had incentive to delay defendant's trial and avoid plea bargaining in hopes of delaying indictment against himself); *Fulton*, 5 F.3d at 609 ("A situation in which the attorney's own interests diverge from those of the client presents the same core problem presented in the multiple representation cases: the attorney's fealty to the client is compromised."). Freund clearly has established actual conflict under this definition. After the firm decided to oppose Trent's motion for severance on Freund's behalf, Trent made serious allegations against Foley and Colton at the severance hearing. If the firm antagonized Trent again by defending Freund on the theory that Trent murdered Walker, it certainly was possible that Trent would produce evidence to support his allegations. Foley and Colton would then be at risk of being disciplined by the Florida Bar or prosecuted by the State. Plainly, then, it was in the firm's best interests not to defend Freund by implicating Trent in Walker's murder.

The majority claims, however, that no actual conflict was created because "the damage was done" once Trent made his allegations at the severance hearing.[32] *Ante* at 866. By making his allegations only after the firm decided to oppose his motion for severance, however, Trent had made it quite clear that he would respond to any attempt by the law firm to harm his interests. At any time before Trent pled guilty to second-degree murder following his mistrial, therefore, it was risky for the firm to defend Freund by implicating Trent in Walker's murder. If the firm pursued such a defense, Trent might have responded by producing evidence to support his allegations or by making addi-

---

31. *Smith*, 815 F.2d at 1405.

32. The majority also points out, *ante* at 866–67, that Colton denied each and every accusation made by Trent "unequivocally and totally" in front of the media—a denial that he obviously was obliged to make if he wanted to avoid prosecution and disciplinary proceedings, particularly given the heavy media presence at the hearing. Even if the allegations actually were false, how-ever, Freund's defense would still have been impaired. *See Fulton*, 5 F.3d at 610 ("[E]ven if the attorney is demonstrably innocent and the government's witness's allegations are plainly false, the defense is impaired because vital cross-examination becomes unavailable to the defendant."); *Freund*, 117 F.3d at 1579 n. 86 (applying this observation to Freund's case and noting that although Trent was not a witness at Freund's trial, he certainly could have been).

tional allegations against the firm's members. The majority has no reason to suppose that Trent was out of ammunition to use against the law firm's members once he had made his severance hearing allegations, or that he would not have been inclined to manufacture additional allegations against the firm if he knew of no actual wrongdoing to disclose.

## B.

### 1.

Turning to the adverse effect of the above conflicts on the firm's performance in representing Freund, Freund claims that two of these conflicts—the firm's obligations arising from its long history of representing Trent and Trent's allegations against Foley and Colton—may be linked to the firm's decision to forgo the reasonable defense strategy of claiming that Trent personally stabbed Walker to death.[33] Despite the majority's efforts to prove otherwise, this claim is not foreclosed by our precedent.

The majority first concludes that a strategy of shifting the blame for Walker's murder to Trent did not meet the first two elements of our test for adverse effect because it was not a plausible defense strategy that was reasonable under the facts. *See United States v. Carter,* 721 F.2d 1514, 1537 (11th Cir.1984) (quoting *United States v. Mers,* 701 F.2d 1321, 1331 (11th Cir.1983)) ("Failure to adopt a strategy of shifting blame may well give rise to an actual conflict of interest, but to do so the strategy must have been an option realistically available to trial counsel."). It offers two arguments to support this conclusion. First, it argues that while all of the State's physical evidence in the Walker murder either belonged to or was found on property belonging to Trent, all three of the State's principal fact witnesses— Mills, Angelilli, and Daniell—testified against Freund. Because Duncan predicted that these witnesses would not change their stories on cross-examination after viewing their testimony at Trent's trial, no fact witnesses were available to corroborate Freund's inno-

cence. Shifting the blame to Trent, in the majority's view, was therefore an unrealistic strategy.

One difficulty with the majority's argument is that it is not possible to conclude with any confidence that attempting to get the witnesses to change their stories on cross-examination "would have proved fruitless," *ante* at 868, when this judgment is being made based on a record that was tainted by conflicts of interest. *See. supra* part I.B. (noting that when we consider whether an alternative defense strategy or tactic is "reasonable under the facts," the decisive "facts" upon which we rely cannot be drawn from a record made *after* the time that the petitioner's case became tainted). In particular, it is difficult to credit Duncan's self-serving post hoc statement at the Rule 3.850 hearing that he did not think he could have effectively impeached the witnesses based on what he saw at Trent's trial.

A second problem is that the majority's argument ignores both the serious credibility problems of the State's principal witnesses and several significant facts that competent, conflict-free counsel could have used to implicate Trent. While the State's witnesses may not have changed their stories on cross-examination, effective cross-examination by conflict-free counsel certainly could have discredited the witnesses sufficiently that the jury would disregard their testimony as biased in favor of Trent, influenced by the drugs and alcohol that each witness used on the night of the murder, and deliberately orchestrated in an effort to reduce their own chances of prosecution. *See Freund,* 117 F.3d at 1553 n. 16 (listing the crimes with which Mills, Angelilli, and Daniell could have been charged for their conduct surrounding Walker's death). In addition, the facts that conflict-free counsel could have used to implicate Trent went well beyond the physical evidence mentioned by the majority. Counsel also could have shown that Trent controlled the events that transpired on the night of the murder, that he had a powerful

---

**33.** As discussed in part II.B.2., *supra,* the firm's ethical obligations to Trent also constrained its ability to pursue the reasonable defense strategy of negotiating a favorable plea agreement for Freund.

race-based motive to murder Walker, that he shot at Walker and lunged at Walker with his knife, and that he had a history of violence, diazepam possession, and other criminal conduct. *See supra* part II.B.2. Therefore, the strategy of defending Freund by claiming that Trent killed Walker cannot be dismissed as unreasonable based on the majority's first argument.[34]

The majority also argues that a defense strategy of shifting the blame for Walker's murder to Trent was unreasonable because Freund admitted to Foley and Duncan that he stabbed Walker and admitted to his psychiatrist that he stabbed Walker because Trent told him to do it. As a result, the majority reasons, the firm's lawyers could have been disbarred if they defended Freund by claiming that Trent murdered Walker.[35] It is certainly true that the ethics rules in effect at the time of Freund's trial prohibited

his lawyers from suborning perjury, knowingly using perjured testimony or false evidence, or knowingly making false statements of fact. *See* Fla.Code of Professional Responsibility DR 7–102(A) (1986). Even if Freund's lawyers had been absolutely certain that Freund—and only Freund—had stabbed Walker,[36] however, these rules would *not* have prevented them from putting the state to its burden of proof by vigorously cross-examining the State's witnesses and by arguing to the jury in closing that the evidence presented at trial did not establish Freund's guilt beyond a reasonable doubt.[37] This vigorous cross-examination could have extended even to matters about which the lawyers either knew or believed that the witness was telling the truth. *See ABA Standards for Criminal Justice* Standard 4–7.6(b) (3d ed. 1993) ("Defense counsel's belief or knowledge that the witness is telling the truth does not preclude cross-examination.").[38] In closing,

---

**34.** This defense strategy was not merely a viable one; it had the potential to be at least as effective as an insanity defense. Freund's own lawyers estimated that the insanity defense was effective only thirty percent of the time or less. In addition, a letter to the prosecutor from Foley reveals that the firm felt that Freund's particular insanity defense had the potential to lead only to a guilty verdict on a lesser charge—not to complete relief from criminal liability. *See Freund,* 117 F.3d at 1581 n. 91. A blame-shifting defense, on the other hand, could have led to a verdict of not guilty.

**35.** Under the majority's theory, Foley would have been subject to discipline for suggesting in his closing argument that Trent might have murdered Walker and then told Freund that it was Freund who did it.

**36.** One basis upon which Freund's lawyers could have disbelieved their client's confession was that Freund told a friend who visited him in jail that he had not killed Walker. In addition, some of the symptoms caused by Freund's brain damage were impaired memory and amenability to influence by others. *See Freund,* 117 F.3d at 1548, 1563–64. Even if the lawyers did believe that Freund stabbed Walker, however, it certainly was possible that Freund was not the *only* person who did so. On the night of the murder, Trent had lunged at Walker with his knife while yelling threats of death and racial epithets. The State's witnesses at Freund's trial also confirmed that Trent periodically was alone with Freund and Walker in the room where Walker was stabbed in both the back and the chest.

**37.** *See, e.g., United States v. Yelardy,* 567 F.2d 863, 867 (6th Cir.1978) (Peck, J., dissenting) ("It

is not the lawyer's role to determine a client's guilt or innocence, and 'reasonable cause to believe' a client guilty cannot ethically affect a lawyer's representation."); *see also* Rules Regulating the Fla. Bar 4–3.1 (1994) ("A lawyer shall not bring or defend a proceeding ... unless there is a basis for doing so that is not frivolous.... A lawyer for the defendant in a criminal proceeding ... may nevertheless so defend the proceeding as to require that every element of the case be established."); ABA Center for Professional Responsibility, *Annotated Model Rules of Professional Conduct* Rule 3.1 comment (3d ed. 1996) ("[The exception in rule 3.1 for criminal proceedings] reflects the constitutional principle that the state must prove every element of the crime charged and may not, by procedural rule or otherwise, shift its burden to the defendant.... Accordingly, the criminal defense lawyer has the ethical obligation to force the government to prove its case.").

**38.** The commentary to Standard 4–7.6 helpfully expands upon this statement:

There unquestionably are many cases in which defense counsel cannot provide the accused with a defense at all if counsel is precluded from engaging in vigorous cross-examination of witnesses either believed or known to have testified truthfully. For example, where the defendant has admitted guilt to the lawyer and does not plan to testify, and the lawyer simply intends to put the state to its proof and raise a reasonable doubt, skillful cross-examination of the prosecution's witnesses is essential. Indeed, were counsel in this circumstance to forgo vigorous cross-examination of the prosecution's witnesses, counsel would violate the

Freund's lawyers could then have argued to the jury any "reasonable inferences from the evidence in the record"[39] in support of the claim that the prosecution had not established Freund's guilt beyond a reasonable doubt. Therefore, it would have been entirely permissible for Freund's lawyers to argue in closing that a reasonable doubt existed as to Freund's guilt because the jury could infer from the evidence that Trent had killed Walker.

After making these unconvincing arguments, the majority turns to the third element of our test for adverse effect and contends that Freund did not establish a link between either of the two actual conflicts mentioned above and the firm's decision not to defend Freund by claiming that Trent personally murdered Walker. As to the first conflict, the majority argues that the firm's obligations arising from its long history of representing Trent did not have a wide-ranging effect on the decisions it made in representing Freund. In support of this argument, the majority notes that the firm did attempt to implicate Trent indirectly in Walker's murder during Freund's trial. While discussing the evidence during his portion of the firm's closing argument to the jury at Freund's trial, Duncan claimed that Trent knew that Freund's mental condition left him susceptible to influence and that Trent manipulated Freund to make him kill Walker. Because this claim could have resulted in a criminal conviction for Trent if proven in a hypothetical joint trial, the majority believes that the firm's decisions were not "colored" by its "allegiance to Trent." *Ante* at 868.

An initial problem with the majority's argument is that Duncan's *indirect* implication of Trent at Freund's trial is not very helpful in answering the question of whether the firm's obligations to Trent may be linked to the firm's decision to forgo the argument that Trent *directly* and personally murdered Walker in favor of an insanity defense. *See Martinez,* 630 F.2d at 363 ("[W]e cannot be

clear duty of zealous representation that is owed the client.
*ABA Standards for Criminal Justice* Standard 4-7.6 commentary (3d ed. 1993).

sure that, because [the lawyer] failed to pull some punches [in questioning his former client for the benefit of his current client], he refrained from pulling others."). Two additional problems with the majority's argument negate any minimal probative value that Duncan's claim might otherwise have.

First, the majority's argument falls under its own weight once one realizes that Trent had already pled guilty to second-degree murder before Freund's separate trial began. Freund's lawyers, although still constrained to follow the insanity defense that they publicly adopted early in the representation, were thus free at trial to abandon a pure insanity defense in favor of a defense that indirectly implicated Trent[40]—by arguing that Trent took advantage of Freund's mental state and ordered Freund to kill Walker—without having to worry that this defense would negatively affect Trent. Tellingly, Freund's lawyers did not support this latter defense by offering any evidence that could have violated their obligation of confidentiality arising from their lengthy representation of Trent. *See supra* part II.B.2. (noting that this obligation limited the firm's ability to support an argument that Freund killed Walker while under Trent's control by presenting evidence of Trent's sexual proclivities and history of violence, diazepam possession, and other criminal conduct).

Another problem with the majority's argument is that it employs the artifice of "Monday morning quarterbacking," importing an element of "cure" into our test for adverse effect by suggesting that Duncan's claim in his closing argument at Freund's trial was sufficient to demonstrate that the firm did not pull its punches against Trent while representing Freund. This suggestion, however, does not in any way affect the conclusion of part II.B., *supra,* that the firm—influenced by its ethically-based conflict of interest—elected at the beginning of Freund's case to forgo the reasonable alternative defense strategy of claiming that Trent per-

**39.** *Id.* Standard 4-7.7(a).

**40.** These are the second and third possible defense strategies described in part II.B.2., *supra.*

sonally murdered Walker. If we were to conclude that Duncan's subsequent partial reversal of this election was sufficient to remove the initial taint that the firm's conflict of interest imposed on its representation of Freund, we would be indulging in a prohibited inquiry into prejudice.[41] *See supra* part I.B.

As to the second conflict, the majority argues that the firm's actual conflict of interest arising from Trent's allegations against Foley and Colton at the severance hearing did not *motivate* the firm's initial decision to reject the defense that Trent murdered Walker. Given that Trent's allegations had not yet been made when the firm announced that it would rely on an insanity defense, the majority certainly may be correct.[42] This argument does not affect the conclusion, however, that Trent's allegations *reinforced* the firm's initial decision to rely on an insanity defense. *See supra* part II.C. Thus, it cannot be said that this actual conflict "played *absolutely* no role in counsel's … strategy." *Buenoano v. Singletary*, 74 F.3d 1078, 1087 (11th Cir.1996) (emphasis added).

### 2.

Freund also claims that the conflict of interest arising from the firm's obligation of confidentiality to Mills may be linked to its decision to forgo the reasonable alternative defense tactic of suggesting on cross-examination that Mills had a pro-Trent bias by eliciting the fact that Trent referred Mills to the firm. In rejecting this claim, the majority states that our test for adverse effect required Freund to show that, *but for* the firm's previous professional relationship with Mills, the firm *would* have questioned Mills about Trent's referring her to the law firm. *Ante* at 869. This is an incorrect statement of our test for adverse effect. All that must be shown under our test is that an alternative strategy or tactic that was reasonable under the facts *might have been* pursued by a conflict-free lawyer, but that this alternative

was inherently in conflict with (or not undertaken due to) the other loyalties or interests of the client's actual lawyer. *See supra* note 6. The majority's statement of the test, by contrast, requires Freund to engage in "unguided speculation" in order to quantify the degree to which the actual representation he received differed from the representation that he hypothetically could have received if represented by conflict-free counsel. Because such speculation smacks of prejudice, we must not require it. *See supra* note 7; *see also Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068 (noting that prejudice is established by showing "that there is a reasonable probability that, *but for* counsel's unprofessional errors, the result of the proceeding *would* have been different" (emphasis added)).

Applying the proper reading of our test for adverse effect to Freund's claim, it is undisputed that the tactic of eliciting that Trent referred Mills to the firm was reasonable under the facts and might have been pursued by a conflict-free lawyer. As to the link between the firm's conflict and its decision not to elicit this information, it is plain that the tactic of asking Mills whether Trent referred her to the very law firm that was cross-examining her at Freund's trial was inherently in conflict with the firm's continuing obligation of confidentiality to her. *See supra* part II.B.2. The majority's claim that no link was established because Duncan's cross-examination of Mills was consistent with the firm's insanity theory of defense is simply a *non sequitur*. The fact that the effect of one of the firm's conflicts of interest—its failure to elicit certain information from Mills on cross-examination—ultimately happened to be consistent with the effect of another of its conflicts—its decision to pursue an insanity defense—is probative of nothing.

### IV.

For the foregoing reasons, we should vacate the district court's denial of Freund's 28

---

41. This response would also apply to any claim that Foley, by suggesting in his closing argument to the jury that Trent may have committed the murder and then told Freund that it was Freund who did it, fully reversed the firm's initial election and removed the taint.

42. If Trent's allegations were true, however, the firm might have anticipated from the very beginning of its representation of Freund that Trent would make these matters public if the firm seriously harmed his interests.

U.S.C. § 2254 petition and remand this case to the district court with the instruction that it grant Freund a writ of habeas corpus.

BIRCH, Circuit Judge, dissenting:

I join in Judge Tjoflat's well-reasoned dissent. A review of both the majority opinion and Judge Tjoflat's response highlight the difficulty in interpreting rules designed to resolve ethical problems. Lawyers who must analyze professional responsibility issues frequently have to chose between the law of ethics and the general law. Thus, a choice of law problem is presented. In resolving that selection process, particularly where ethical concerns arise, one of two approaches may be taken. Since law consists of rules to solve problems, *a fortiori*, one can analyze the rule or one can analyze the problem to which the rule is directed. Stated differently, does one apply the rule as written or does one apply the rule in accord with its purpose.* The analyze-the-rule approach works when the facts are within the rule's jurisdiction, but fails when the facts are beyond the rule's jurisdiction. How then should such a determination be made?

I submit that a workable test for determining whether the facts are within the jurisdiction of a rule of ethics is whether the application of the rule creates a dilemma for the lawyer. Thus, problems of professional responsibility within a rule's jurisdiction tend to be simple ones; problems not within the rule's jurisdiction tend to be dilemmatic. Accordingly, when the problem is simple, the analyze-the-rule approach is adequate; when the problem is dilemmatic, the analyze-the-problem approach is most productive. In the foregoing analysis by the majority, the wrong approach to analysis has been pursued because it emphasizes the analyze-the-rule approach where the facts are outside of the rule's jurisdiction. In the fact problem set out in this case the lawyers were clearly dual fiduciaries with respect to several clients. Their situation was manifestly dilemmatic. As Judge Tjoflat's persuasive analysis concludes, a dual fiduciary cannot negate the right of one beneficiary to benefit another beneficiary. Freund's lawyers were burdened by irreconcilable conflicts of interest that rendered their representation constitutionally defective.

---

\* L. Ray Patterson, *Lawyer's Law: Procedural Malpractice and Disciplinary Issues* (Matthew Bender 1998).